**2020 IL 124688**

# IN THE

# SUPREME COURT

# OF

# THE STATE OF ILLINOIS

_____

(Docket No. 124688)

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v.
RORY SWENSON, Appellant.

*Opinion filed June 18, 2020.*

JUSTICE GARMAN delivered the judgment of the court, with opinion.

Chief Justice Anne M. Burke and Justices Karmeier, Theis, and Michael J.
Burke concurred in the judgment and opinion.

Justice Neville dissented, with opinion, joined by Justice Kilbride.

## OPINION

¶ 1    Defendant Rory Swenson was convicted of disorderly conduct in the circuit
court of Winnebago County after a telephone conversation with the advancement
director of a private school. In that call, he asked about the school's security
measures and spoke extensively about shootings and violence. The conversation

caused a soft lockdown at the school and a police response. We are called on to decide whether defendant's speech was protected by the first amendment to the United States Constitution.

¶ 2                                    BACKGROUND

¶ 3       On December 7, 2015, defendant placed a call to Keith Country Day School (Keith), a private school in Winnebago County. He left a message for the director of advancement. When she called him back, he asked questions and gave statements about school security, mass shootings, and gun violence. These questions and statements disturbed and alarmed the director, who texted another administrator to call the police and lock down the school. Defendant was arrested and eventually charged with attempted disorderly conduct (720 ILCS 5/8-4(a), 26-1(a)(3.5) (West 2014)), phone harassment (*id.* § 26.5-2(a)(2)), and disorderly conduct (*id.* § 26-1(a)(1)). The case proceeded to a bench trial.

¶ 4       The State called two witnesses. The first was the police officer who was dispatched to defendant's home to investigate the call. He testified that he called defendant, who did not answer but came outside within a minute of the officer's call. He said that defendant admitted calling the school to ask about security. He testified that he arrested defendant for disorderly conduct and placed him in the back of his police cruiser. He agreed that defendant was at all times cooperative and that defendant had also told him that he was trying to get information about the school because he was considering transferring his son there. He stated that, after he arrested defendant, defendant asked him to go into his apartment to get defendant's seven-year-old son, who was inside. He testified that defendant told him, after he asked, that he had no guns in the apartment and that he did not see any in plain view when he entered.

¶ 5       The director of advancement, Monica Krysztopa, testified that she handles admissions, fundamental needs, and alumni relations at Keith. She stated that she had been at the school for a year and a half and that she fielded calls from parents looking to enroll their children at Keith. She testified that she returned to her office to a message from a man named Rory who asked her to return his call regarding admissions at Keith. She called the number left in the voicemail, and the individual who answered identified himself as defendant. Defendant stated that he had a son

that he would be interested in enrolling at Keith. She stated that defendant then "immediately went into a battery of questions about the protocol at our school for handling things that were related to guns and shooting." She testified that he asked such questions as whether the secretary's desk had bulletproof windows and how prepared she would be "if he or anyone \*\*\* arrived on our campus with guns." She testified that he also "mentioned \*\*\* in passing that the United States was full of socialists and KGB members." He asked if the school followed truancy laws.

¶ 6 Krysztopa stated that defendant mentioned the mass shooting in San Bernardino, which she testified was a week prior to the call. She testified that defendant asked her if she knew the number of shootings or the success rate of shooters once they were on campus. She said that he told her that it would be important for the school to know the success rate when an armed individual was on campus. She stated that he asked her, "[I]s Keith prepared? You know San Bernardino had happened the week prior and were we prepared for that, that day had it happened at our school that day." The statement that stood out most to her was when he asked her if she "was prepared to have the sacrificial blood of the lambs of our school on our, on my hands, if this were to happen and what would I do?" She interpreted that question as asking her if she was prepared to have that blood on her soul or on her person. When asked to say exactly what defendant said about entering the school with a gun himself, as closely as she could, she testified that "[h]e said if he were to show up at the campus with a gun what would be the protocol of our school?" He asked, according to Krysztopa, whether the school gave teachers "PEZ dispensers to defend themselves" and what the students would think "of seeing a gun pointed in their teacher[']s face."

¶ 7 According to Krysztopa, he continued by asking "if teachers were prepared to have a gun in their face" and whether they carried guns. "[H]e talked about a number of guns and their success rate in kill." She stated that he asked her "how long it would take the police to get to Keith School should there be a shooting." Her "impression was, to be perfectly honest, that he was on our campus." She testified that she got that impression based on two specific questions: "the one about me being prepared to have the blood of the sacrificial lambs on my hands that day and if we were prepared to handl[e] something like San Bernardino that day. And he spoke of the woods around the campus." After refreshing her recollection with her notes, Krysztopa testified that defendant

"was talking about when you shoot and kill children and you're looking them in the eye and their innocence and the pillows of laying their heads down at night and then you have a shooter who shoots them in the face, you know, what does that do for me as a school? How do we protect them from that?"

She thought that he "wanted to know if [she] would sniff the pillow of their innocence after they've been dead." At the end of the conversation, Krysztopa said that defendant asked if the conversation was being recorded. She said that she "was trying to be light" and told him that "we have copiers that don't even work in our school. I'm not recording this." She said that he "went on and said, again, asking about our protocol, how we handle shooters *** and I was talking with him [when] he did say he had to go, the conversation was done and he hung up."

¶ 8       Krysztopa testified that, during the conversation, she texted the head of the school, telling her "[t]here's someone talking about guns and the safety of the school, call 911." Someone called 911, and the school went into a soft lockdown, which she described as a situation in which students were put into closed classrooms with an adult present to account for each student and determine a count of the entire student body. She stated that this was the only time the school had entered a soft lockdown in the year and a half that she worked there. With an officer dispatched to defendant's home and two officers on campus, she testified that, because it was close to dismissal time, they dismissed the students. Fifteen minutes after dismissal, the school sent a letter to parents informing them that a threat had been made without going into detail about the threat. She later clarified that she initiated the police contact for two reasons: (1) because she thought defendant was on the campus, which she posited would mean there was an active shooter on campus, and (2) because she did not know why defendant shared with her that he had been kicked out of Keith as a child, which led her to think that he was an active shooter on campus.

¶ 9       On cross-examination, Krysztopa agreed that the voicemail stated that defendant was interested in talking about admissions and potentially transferring his son to Keith. When she called him, he told her that his son was in second grade and that he was looking to transfer him from Rockford Public Schools. She testified that he mentioned "that he was concerned about the security protocols in the public schools." She did not know any other intention for the call than defendant's

intention to transfer his son from the public school to a private school. She said that defendant never told her that he had guns nor did he say he was coming to the school with guns; rather, she agreed, "[h]e asked what would happen if someone came to the school with a gun." She stated that defendant did not make an immediate threat.

¶ 10     At the close of the State's case, defendant moved for a directed verdict on all counts. The trial court granted that motion as to the phone harassment charge but not the disorderly conduct or attempted disorderly conduct counts.

¶ 11     Defendant testified that his son was seven years old at the time of the call and that he was enrolled in second grade at a public school. He testified that he was concerned with security in the public school system and considered enrolling his son in "what [he] believed would be a privatized institution of learning where they weren't bound by budgeting restrictions used as an excuse not to protect our children." Keith was the first on his list, followed by two religious schools. He stated that he called Keith and received a call back from Krysztopa. He continued that he "asked [about] two things": "financial aid because I'm a single parent" and "the security protocol." Information about these two things, he said, was the purpose of his call. Regarding the security protocol, he asked if Krysztopa could even talk to him about it over the phone; "[i]f need be, when I come to fill out the financial aid information, I can talk to you about it then is exactly what I said to her." He said that he told Krysztopa that his intent was to enroll his son in the school and that he included that statement in the voicemail message. He stated that he "absolutely" did not threaten anyone and that he "absolutely" did not say that he was going to bring a gun to the school. He testified that he did not have a Firearm Owner's Identification card or own any weapons and that he told this to the responding officer. He also testified that he allowed the officer into his home.

¶ 12     On cross-examination, defendant testified that he asked about the school's programs, such as whether they "still taught foreign languages for young children" and "[i]f they still had the art room." He said that he asked about the curriculum but not about the students' schedules. He said that "if there was a security protocol issue with me talking to her over the phone that I would be more than willing to come in and talk with her when I fill out the financial aid papers for the financial aspect of enrolling my son in the school." He admitted that he asked whether

- 5 -

teachers carry guns, but he denied asking whether he would be shot and killed if he came into the school and started shooting. He also denied asking what a child's life was worth and answering himself that a child's life was worth $67,000. Rather, he testified, he explained that "if they would fire a teacher for a $67,000 salary cap and hire an off-duty police officer that they would be able to protect children with a response time which would lower the casualty rate by 73 to 86 percent should there be an active shooter scenario at any school." He again denied asking what would happen if he were to enter the school with a gun. In response to a question asking whether he said that it would take two to four minutes for police to arrive at the school, he explained that "general protocol for my son's school that a two- to four-minute-response time was inadequate for what I thought should be my job as a parent to protect my son at school when I am not there to be able to do that." He also denied asking Krysztopa if she was ready to see the blood of the sacrificial lamb, claiming that he said "if the liberal left wants to make me their sacrificial lamb so be it. Then the blood is on their hands next time there is a school shooting in regards to civil ramifications." He also explained that his concern with his son's current school was that "nothing more than a piece of quarter inch glass separates our children *** from an active shooting scenario." After agreeing that Keith was the first school that he called, he stated that he also called the two religious schools in the time between leaving a message at Keith and receiving the call back. Defendant testified that, when the police arrived, he went outside to "see what was going on" and, when asked by the officer, explained that he "called to enroll my son in a school and [Krysztopa] took [defendant's] political affiliation and spun it out of context."

¶ 13    After closing argument, the trial court found all three witnesses to be credible. It found that, where defendant's and Krysztopa's testimony conflicted, hers was more credible. Regarding the attempted disorderly conduct, the court found that defendant did not make a threat and acquitted him of that charge. Regarding the disorderly conduct charge, the court again stated that it did not think that defendant was threatening the school but found that he acted in an unreasonable manner. The court found that Krysztopa was alarmed and disturbed and that defendant should have known that she would be disturbed. The judge expressly found that the unreasonableness was in the nature of the questions defendant asked. He further found that defendant knowingly acted unreasonably and convicted him of disorderly conduct. Defendant was sentenced to two days in jail with credit for two

days served, a term of probation, and a fine. The appellate court affirmed. 2019 IL App (2d) 160960, ¶ 29. We granted leave to appeal. Ill. S. Ct. R. 315 (eff. July 1, 2018).

¶ 14                                              ANALYSIS

¶ 15    Defendant was convicted of disorderly conduct. "A person commits disorderly conduct when he or she knowingly: (1) Does any act in such unreasonable manner as to alarm or disturb another and to provoke a breach of the peace[.]" 720 ILCS 5/26-1(a)(1) (West 2014).

¶ 16    Defendant asserts that the only conduct in which he engaged was speech. He argues that his speech was protected by the first amendment to the United States Constitution, that the courts below misunderstood the requisite mental state, and that the appellate court incorrectly applied this court's decision in *People v. Raby*, 40 Ill. 2d 392 (1968). We first address defendant's contentions of first amendment protection.

¶ 17                                *First Amendment Protection*

¶ 18    "The first amendment, which applies to the states through the fourteenth amendment, precludes the enactment of laws 'abridging the freedom of speech.' " *People v. Relerford*, 2017 IL 121094, ¶ 31 (quoting U.S. Const., amends. I, XIV). Because of this restriction, the " 'government has no power to restrict expression because of its message, its ideas, its subject matter, or its content.' " *United States v. Alvarez*, 567 U.S. 709, 716 (2012) (quoting *Ashcroft v. American Civil Liberties Union*, 535 U.S. 564, 573 (2002)).

¶ 19    The constitutionality of a statute presents a legal question that we review *de novo*. *People ex rel. Hartrich v. 2010 Harley-Davidson*, 2018 IL 121636, ¶ 13. The trial court's underlying credibility and factual findings, however, are reversed only if they are against the manifest weight of the evidence. *Id.* Defendant does not claim that the statute is facially unconstitutional but instead makes an as-applied challenge, which "asserts that the particular acts which gave rise to the litigation fall outside what a properly drawn regulation could cover." *Vuagniaux v.*

*Department of Professional Regulation*, 208 Ill. 2d 173, 191 (2003). In an as-applied challenge, the challenging party "protests against how an enactment was applied in the particular context in which the [party] acted or proposed to act, and the facts surrounding the [party's] particular circumstances become relevant." *Napleton v. Village of Hinsdale*, 229 Ill. 2d 296, 306 (2008).

¶ 20     We first consider whether defendant's discussion with Krysztopa constituted speech or expression as contemplated by the first amendment. Although defendant ostensibly called to inquire about enrolling his son at Keith, he asked rhetorical questions such as whether Krysztopa would sniff the pillows of schoolchildren's innocence if they were shot. He told the responding officer that Krysztopa "took [his] political affiliation and spun it out of context." Although we do not doubt that defendant indeed called to gather information and potentially enroll his son at the school sometime in the future, he also intended some of his questions and statements to express his sentiments about the state of school security in general, at Keith, or both.

¶ 21     Moreover, we agree that defendant did not engage in any conduct other than speech. In *Raby*, this court held that "[u]nder no circumstances would the [disorderly conduct] statute 'allow persons to be punished merely for peacefully expressing unpopular views.' " *Raby*, 40 Ill. 2d at 397 (quoting *Cox v. Louisiana*, 379 U.S. 536, 551 (1965)). Our appellate court has cited this statement to support what it calls "the long-standing principle that speech alone cannot form the basis for a disorderly conduct charge." *People v. Rokicki*, 307 Ill. App. 3d 645, 652 (1999). Another panel stated the holding more accurately: "[i]n *Raby*, our supreme court rejected the proposition that the disorderly conduct statute punishes speech protected by the first amendment." *People v. Nitz*, 285 Ill. App. 3d 364, 369 (1996). Because the only action in which defendant engaged was speech and because the disorderly conduct statute cannot criminalize protected speech, defendant's conviction can stand only if his speech was unprotected.

¶ 22     Our first step is to determine whether the statute, as applied to defendant, is a content-based speech restriction. "Government regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed." *Reed v. Town of Gilbert*, 576 U.S. ___, ___, 135 S. Ct. 2218, 2227 (2015). A statute restricting speech is content based if "it is the content

of the speech that determines whether it is within or without the statute's blunt prohibition." *Carey v. Brown*, 447 U.S. 455, 462 (1980); see also *People v. Jones*, 188 Ill. 2d 352, 358 (1999) (citing *Carey*, 447 U.S. at 462). There is no question that it was the content of defendant's speech that alarmed and disturbed Krysztopa. He could have asked about school lunches, classes, asbestos pipes, tuition, the school day, or just about any other subject, and she would not have become alarmed and disturbed. It was the topic of guns, violence, and school safety—the content of his speech—that led to the alleged breach of the peace.

¶ 23        "Content-based laws—those that target speech based on its communicative content—are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Reed*, 576 U.S. at ___, 135 S. Ct. at 2226 (citing *R.A.V. v. St. Paul*, 505 U.S. 377, 395 (1992)). There exist, however, " 'certain well-defined and narrowly limited classes of speech, the prevention and punishment of which have never been thought to raise any Constitutional problem.' " *Beauharnais v. Illinois*, 343 U.S. 250, 255-56 (1952) (quoting *Chaplinsky v. New Hampshire*, 315 U.S. 568, 571-72 (1942)). Content-based restrictions on these categories of speech do not fall within the protection of the first amendment and have been upheld. *People v. Ashley*, 2020 IL 123989, ¶ 31 (citing *United States v. Stevens*, 559 U.S. 460, 468 (2010)). Of the handful of exceptions, only two could potentially apply here: the "true threats" exception (*Virginia v. Black* 538 U.S. 343, 359 (2003); *Ashley*, 2020 IL 123989, ¶ 31) and the "fighting words" exception (*Beauharnais*, 343 U.S. at 256).

¶ 24                    *The True Threats Exception to First Amendment Protection*

¶ 25        The "accepted categories of unprotected speech include true threats, which may be banned without infringing on first amendment protections." *Ashley*, 2020 IL 123989, ¶ 31. " 'True threats' encompass those statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals." *Black*, 538 U.S. at 359; *Ashley*, 2020 IL 123989, ¶ 33. " 'The speaker need not actually intend to carry out the threat. Rather, a prohibition on true threats "protect[s] individuals from the fear of violence" and "from the disruption that fear engenders," in addition to protecting people "from the possibility that the threatened violence will occur." ' " *Ashley*,

2020 IL 123989, ¶ 33 (quoting *Black*, 538 U.S. at 359-60, quoting *R.A.V.*, 505 U.S. at 388).

¶ 26    We first note that the trial court acquitted defendant of attempting to threaten the school or its employees. That charge is not before us. In convicting him of disorderly conduct, the court stated again that it knew "[he] wouldn't threaten them." In cases in which "the question is one of alleged trespass across the line between speech unconditionally guaranteed and speech which may legitimately be regulated," however, "the rule is that we examine for ourselves the statements in issue and the circumstances under which they were made to see . . . whether they are of a character which the principles of the First Amendment, as adopted by the Due Process Clause of the Fourteenth Amendment, protect." (Internal quotation marks omitted.) *New York Times Co. v. Sullivan*, 376 U.S. 254, 285 (1964); see also *Miller v. California*, 413 U.S. 15, 25 (1973) ("[T]he First Amendment values applicable to the States through the Fourteenth Amendment are adequately protected by the ultimate power of appellate courts to conduct an independent review of constitutional claims when necessary."); *Bose Corp. v. Consumers Union of United States, Inc.*, 466 U.S. 485, 510-11 (1984) ("The requirement of independent appellate review reiterated in *New York Times Co. v. Sullivan* is a rule of federal constitutional law. *** It reflects a deeply held conviction that judges— and particularly Members of [the Supreme Court]—must exercise such review in order to preserve the precious liberties established and ordained by the Constitution."). We thus independently examine the record and assess the testimony to determine whether a first amendment exception applies.

¶ 27    The parties, noting the split among other jurisdictions, disagree as to the mental state requirement for conveying a true threat. After submission of their briefs and oral argument, however, we have resolved that issue in Illinois. We recently held that, to make a true threat, a defendant must act with either a "specific intent or a knowing mental state." *Ashley*, 2020 IL 123989, ¶ 55. Thus, the accused does not have to act with specific intent to threaten the victim (*id.* ¶ 50) but "must be subjectively aware of the threatening nature of the speech" (*id.* ¶ 56). Although criminal liability cannot be predicated solely on the effect on the listener, the effect is something the court must consider. *Id.* ¶ 67 (citing *Elonis v. United States*, 575 U.S. at ___, 135 S. Ct. at 2011-12). Given the recency of that opinion, we need not repeat its reasoning.

¶ 28 Krysztopa testified that defendant asked her if she was "prepared to have the blood of the sacrificial lambs on [her] hands *that day*." (Emphasis added.) He asked "if teachers were prepared to have a gun in their face." He asked her "how long it would take the police to get to Keith School should there be a shooting." He expressed familiarity with the school campus and asked how prepared she would be "if *he* or anyone *** arrived on our campus with guns." (Emphasis added.) Although defendant disputes that he made some of these statements, the trial court found Krysztopa to be the more credible witness. Notably, although we independently review the record to assess the applicability of exceptions to first amendment protection (*Sullivan*, 376 U.S. at 285), the trial court's decision to accept testimony remains entitled to great deference (*Hartrich*, 2018 IL 121636, ¶ 13; *People v. Cunningham*, 212 Ill. 2d 274, 280 (2004); *People v. Phelps*, 211 Ill. 2d 1, 7 (2005) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979))).

¶ 29 Regarding defendant's mental state, the trial court found that he did not specifically intend to threaten the school when it acquitted him of attempted disorderly conduct. The court's admonishment to defendant in convicting him of disorderly conduct, however, makes clear that it found that he was subjectively aware of the threatening nature of his speech: "You don't expect that she's going to be alarmed and disturbed? You would be alarmed and disturbed. I submit that you would be alarmed and disturbed if your child was there and you knew there was such a call."

¶ 30 We agree. Defendant pointed out what he perceived to be inadequacies in the security measures Keith had taken by presenting graphic hypothetical scenarios that, by design, communicated to the listener "a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals." *Black*, 538 U.S. at 359; *Ashley*, 2020 IL 123989, ¶ 33. Whether defendant intended to carry out the acts is irrelevant; he meant to intimidate Krysztopa by impressing upon her " ' "the possibility that the threatened violence will occur." ' " *Ashley*, 2020 IL 123989, ¶ 33 (quoting *Black*, 538 U.S. at 359-60 (quoting *R.A.V.*, 505 U.S. at 388)). Indeed, defendant's intention in presenting these scenarios to Krysztopa was to alert her that they could happen in spite of the measures Keith had taken. He conveyed his opinion about the insufficiency of these measures by frightening Krysztopa.

¶ 31 Regarding the effect on the listener, the trial court found that Krysztopa was alarmed and disturbed. In this situation, the only way she would have been alarmed and disturbed is if she perceived defendant's questions and statements as a threat to the school's safety. These statements are objectively threatening, given the circumstances in which they were made—to a school administrator in her official capacity at a school full of students and teachers five days after a highly publicized mass shooting and during an era in which school administrators must be concerned with individuals who pose such threats. Krysztopa was reasonable in perceiving these statements and questions as a threat.

¶ 32 In sum, defendant's questions and statements were objectively threatening in the circumstances in which they were given. Defendant was subjectively aware of the threatening nature of his speech. Krysztopa reasonably perceived defendant's questions and statements as a threat. We find that his speech constituted a true threat unprotected by the first amendment.

¶ 33 Because we find that defendant's speech fell within the "true threats" exception, we need not address the parties' contentions regarding other exceptions to first amendment speech protection. We next turn to the sufficiency of the evidence presented.

¶ 34                                   *Sufficiency of the Evidence*

¶ 35 "When considering a challenge to a criminal conviction based upon the sufficiency of the evidence, this court will not retry the defendant." *People v. Smith*, 185 Ill. 2d 532, 541 (1999). Rather, a reviewing court will set aside a conviction only where the evidence is so improbable or unsatisfactory that it creates a reasonable doubt of the defendant's guilt. *People v. Collins*, 106 Ill. 2d 237, 261 (1985). Where the defendant challenges the sufficiency of the evidence used to convict him, the reviewing court must determine, considering the evidence in the light most favorable to the prosecution, whether any rational trier of fact could have found the essential elements met beyond a reasonable doubt. *Smith*, 185 Ill. 2d at 541. All reasonable inferences are drawn in favor of a finding of guilt. *Cunningham*, 212 Ill. 2d at 280.

¶ 36    The trier of fact determines the credibility of the witnesses, decides what weight to give their testimony, resolves conflicts in the evidence, and draws reasonable inferences from that evidence. *Phelps*, 211 Ill. 2d at 7 (citing *Jackson*, 443 U.S. at 319). Credibility determinations are entitled to great weight. *Smith*, 185 Ill. 2d at 542. "In cases where the evidence is close *** , where findings of fact must be determined from the credibility of the witnesses, a court of review will defer to the trial court's factual findings unless they are against the manifest weight of the evidence." *Kalata v. Anheuser-Busch Cos.*, 144 Ill. 2d 425, 433 (1991); see also *Hartrich*, 2018 IL 121636, ¶ 13 (citing *Kalata*, 144 Ill. 2d at 433). "[T]he testimony of just one credible witness is sufficient for conviction." *City of Chicago v. Morris*, 47 Ill. 2d 226, 230 (1970).

¶ 37    The State needed to prove that defendant knowingly engaged in an act in such an unreasonable manner as to alarm or disturb another and to provoke a breach of the peace. See 720 ILCS 5/26-1(a)(1) (West 2014). " '[T]he gist of the offense is not so much that a certain overt type of behavior was accomplished, as it is that the offender knowingly engaged in some activity in an unreasonable manner which he knew or should have known would tend to disturb, alarm or provoke others.' " *Raby*, 40 Ill. 2d at 397 (quoting Ill. Ann. Stat., ch. 38, ¶ 26-1, Drafting Committee Comments (Smith-Hurd 1967)). "The 'type of conduct alone is not determinative, but rather culpability is equally dependent upon the surrounding circumstances.' " *In re B.C.*, 176 Ill. 2d 536, 552 (1997) (quoting 720 ILCS 5/26-1, Committee Comments-1961, at 337 (Smith-Hurd 1993)).

¶ 38    As we described above, defendant assailed Krysztopa with a battery of morbid and morose questions and statements about killing schoolchildren and sticking guns in teachers' faces until the police arrived at his home. Although defendant disputes that he made some of these statements, the trial court found Krysztopa to be the more credible witness. Where the only witnesses to the substance of a conversation are the two parties to that conversation and the trial court found one more credible than the other, we decline to find that the court's credibility finding was against the manifest weight of the evidence, especially where that witness had taken contemporaneous notes and the trial court expressly noted that it observed "her demeanor while testifying."

- 13 -

¶ 39    The trial court found the elements of disorderly conduct met. It found the nature of the questions defendant asked to be unreasonable, that Krysztopa was alarmed and disturbed, that she reasonably felt that way, and that defendant's questions and statements provoked a breach of the peace by way of the lockdown and police response. It found that defendant acted knowingly.

¶ 40    We agree. Defendant knowingly engaged in the series of questions and statements that form the basis for the conviction in an unreasonable manner that he knew or should have known would cause alarm to a school administrator. He unreasonably subjected Krysztopa, in her official capacity as a school administrator, to a rapid-fire succession of graphic questions and statements about such things as shooting schoolchildren and sticking guns in teachers' faces, understandably alarming and disturbing her. His questions and statements directly resulted in a breach of the peace by way of a school lockdown and police response. We find that a rational trier of fact could conclude beyond a reasonable doubt that defendant committed the offense of disorderly conduct. We do not find the evidence so improbable or unsatisfactory that it creates a reasonable doubt about his guilt. We thus find the evidence sufficient and affirm defendant's conviction.

¶ 41                                    CONCLUSION

¶ 42    We find that a rational trier of fact could conclude that the elements of disorderly conduct were proven beyond a reasonable doubt and that the evidence was not so improbable or unsatisfactory as to create a doubt about defendant's guilt. We further find that defendant's questions and statements constituted a true threat such that his speech was not protected by the first amendment to the United States Constitution. The statute was thus constitutional as applied to defendant's conduct.

¶ 43    Affirmed.

¶ 44    JUSTICE NEVILLE, dissenting:

¶ 45    I agree with the court's recitation of the law governing the analysis of whether speech is exempt from first amendment protection because it falls within the "true

threat" exception. I disagree, however, with the application of those controlling principles to the facts presented in this case. Accordingly, I respectfully dissent.

¶ 46    As this court unanimously recognized in *People v. Ashley*, the true threat exception encompasses " 'statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals.' " 2020 IL 123989, ¶ 33 (quoting *Virginia v. Black*, 538 U.S. 343, 359 (2003)). When defendant's speech is analyzed in accordance with these strictures, it is clear to me that his communication with Krysztopa does not constitute a true threat.

¶ 47    First, as Krysztopa's own testimony establishes, defendant expressly stated that his reason for calling was to inquire about enrolling his son at the school and to explore its security protocols and approach to potentially violent situations. There is no evidence to the contrary or even suggesting that he called for any other purpose. When considered in the context of a parent's inquiry about the transfer and enrollment of his or her child, questions regarding school safety and security measures are not inherently unreasonable. In addition, Krysztopa's testimony confirms that virtually all of defendant's communications regarding the possible enrollment of his son at the school and its safety procedures were expressed in the form of questions—posing hypothetical situations and requesting answers as to how such situations would be handled in order to protect the safety of all students. The context of defendant's communication—an inquiry about school enrollment— and the hypothetical nature of many of his questions regarding student safety are critical in assessing whether his speech constitutes a true threat. See *Watts v. United States*, 394 U.S. 705, 707-08 (1969) (recognizing that, in distinguishing a threat from constitutionally protected speech, the context of the speech, its conditional nature, and the reaction of the listeners are determining factors). In my view, these factors are not properly considered by the court's opinion.

¶ 48    Second, though I agree that the effect on the listener must be considered (see *supra* ¶ 30 (citing *Ashley*, 2020 IL 123989, ¶ 67); *supra* ¶ 31), I disagree with the court's conclusion that defendant's questions and statements to Krysztopa were "objectively threatening" (*supra* ¶ 31). If that were the case, Krysztopa's perception of defendant's communication would be irrelevant. And even more important is the fact that Krysztopa's own description of defendant's communication refutes the

conclusion that it was a true threat. Her undisputed testimony confirms that defendant did not make an immediate threat, and he never said he had a gun or that he was coming to the school with a gun. Indeed, review of Krysztopa's testimony demonstrates that defendant never said that he intended to do anything at all. Rather, defendant, a single father of a school-age child, expressed his concerns about school safety and the security protocols in place in public schools that were, in his view, inadequate to protect the students.

¶ 49 While defendant's questions and comments may be seen as excessive and troubling, they do not contain the requisite elements of a true threat. Here, the court's opinion equates defendant's questions and statements about school shootings and safety measures with a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals. Compare *Ashley*, 2020 IL 123989, ¶ 33, with *supra* ¶ 30. My colleagues in the majority agree with the circuit court's characterization of defendant's communications as unreasonable, alarming, and disturbing and, on that basis, find them to qualify as true threats. But many types of communications may be unreasonable, alarming, and disturbing without being true threats. What is missing in this case is evidence of the critical element—a serious expression of intent to commit an act of unlawful violence.

¶ 50 A single communication with an advancement director about the possible transfer of his son and the school's safety protocols served as the catalyst for the prosecution. That communication—and the lack of any actual threat of violence— is in stark contrast to the facts presented in *Ashley*. In that case, the defendant sent numerous text messages specifically directed at the victim that included threats of physical harm or death as well as a picture of a gun. *Ashley*, 2020 IL 123989, ¶¶ 9, 99. For example, the defendant in *Ashley* sent the victim text messages stating " 'I love you too much to see u dead dummy. But [I] guarantee u this. I can make u suffer. If [I] want to. *** You rite start to think more before u talk that s*** will get u hurt or killed ***. *** I hope whoever you got it when I got guns' " *Id.* ¶ 9. He also telephoned the victim and specifically threatened to "come over and kill" her, and everyone else who was present at her apartment, with a gun. *Id.* ¶¶ 5, 100. Here, none of defendant's questions or comments pertaining to hypothetical situations involving possible school shootings are even remotely comparable to the threatening speech that was at issue in *Ashley*. Unfortunately, the majority does not

acknowledge the substantial evidence of threatening speech presented in *Ashley*, let alone explain how defendant's speech meets the standard applied in *Ashley*.

¶ 51    While Krysztopa's apprehension and reaction to defendant's speech may be perfectly understandable, this case considers only whether the State can criminalize defendant's pure speech as a "true threat." Notably, this court and the United States Supreme Court have narrowly construed the true threat exception to first amendment protection for pure speech. *Black*, 538 U.S. at 359; *Ashley*, 2020 IL 123989, ¶ 33. And for good reason—the first amendment broadly protects the rights of all citizens to engage in meaningful discussion and debate on important societal issues, such as the question of whether a school is adequately protecting its students from the dangers of a potential mass shooting. Many of the complicated problems facing our society have the potential to result in serious debate and, at times, emotional rhetoric. Absent a serious expression of an intent to commit an act of unlawful violence, however, even the most passionate speech cannot be criminalized as a true threat without violating the first amendment. *Black*, 538 U.S. at 359; *Ashley*, 2020 IL 123989, ¶ 33; see also *Watts v. United States*, 394 U.S. 705, 707 (1969) (*per curiam*) (explaining that a statute that "makes criminal a form of pure speech must be interpreted with the commands of the First Amendment clearly in mind. What is a threat must be distinguished from what is constitutionally protected speech.").

¶ 52    Nonetheless, the majority has allowed the State to use the disorderly conduct statute to criminalize defendant's speech because Krysztopa was alarmed or disturbed by his speech. In other words, the majority has effectively eliminated the well-settled requirement that a "true threat" include a serious expression of an intent to commit an act of unlawful violence. *Black*, 538 U.S. at 359; *Ashley*, 2020 IL 123989, ¶ 33. The majority's watered-down interpretation of a "true threat" has never been endorsed by the United States Supreme Court and, until today's decision, not by this court either.

¶ 53    Instead, we have long recognized that the disorderly conduct statute should not be used to punish persons " 'merely for peacefully expressing unpopular views.' " *People v. Raby*, 40 Ill. 2d 392, 397 (1968) (quoting *Cox v. Louisiana*, 379 U.S. 536, 551 (1965)). The result reached in the majority's opinion, however, criminalizes defendant's speech because certain of his questions or statements were viewed by

Krysztopa as alarming or disturbing. It is worth emphasizing that, according to Krysztopa's undisputed testimony, defendant did not make any threats to her, and he did not state that he had a gun or intended to come to the school. The majority's analysis ignores the bare facts set forth in Krysztopa's testimony. Contrary to the court's unfounded conclusion, Krysztopa did not perceive defendant's communication as a threat.

¶ 54 Based on the evidence in the record, defendant's questions and statements may be both alarming and disturbing, but they are not true threats because they do not contain a serious expression of an intent to commit an act of unlawful violence. See *Black*, 538 U.S. at 359; *Ashley*, 2020 IL 123989, ¶ 33. Because defendant's statements do not qualify as a true threat, they do not fall into the exception and are not excluded from first amendment protection. Since his comments are protected speech, they cannot be prosecuted under the disorderly conduct statute. I would find the disorderly conduct statute to be unconstitutional as applied to defendant.

¶ 55 Consequently, I respectfully dissent.

¶ 56 JUSTICE KILBRIDE joins in this dissent.