2021 IL App (1st) 190888-U

FIRST DISTRICT
FIRST DIVISION
March 1, 2021

No. 1-19-0888

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) | Appeal from the Circuit Court of |
| | ) | Cook County, Illinois. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) | No. 16 CR 1510 |
| | ) | |
| MYLES REDMOND, | ) ) | Honorable |
| | ) | Lawrence E. Flood, |
| Defendant-Appellant. | ) | Judge Presiding. |

_____

JUSTICE COGHLAN delivered the judgment of the court.
Justice Hyman specially concurred, joined by Presiding Justice Walker.

**ORDER**

¶ 1     *Held*: The trial court did not err in denying defendant's motion to quash arrest and suppress incriminating statements because there was probable cause to arrest defendant and the officer's "hot pursuit" of defendant justified the warrantless entry into his residence. The evidence was sufficient to convict defendant of being an armed habitual criminal.

¶ 2     Following a bench trial, defendant Myles Redmond was convicted of being an armed habitual criminal and sentenced to a term of six years in the Illinois Department of Corrections. On appeal, defendant argues that the trial court erred in denying his motion to quash arrest and

suppress evidence and that the evidence was insufficient to prove his conviction of being an armed habitual criminal beyond a reasonable doubt. For the reasons stated herein, we affirm.

¶ 3                                    Motion to Suppress

¶ 4        Prior to trial, defendant moved to quash his arrest and suppress his post-arrest statements to the police, alleging that "the police did not have a search warrant nor exigent circumstances to enter the residence." At the hearing on the motion, Chicago police officer Patrick Martino (Martino) testified that on January 1, 2016, he was on patrol in an unmarked squad car with his partners, officers Anthony Pavone (Pavone), Robert Peraino (Peraino), and Christopher Cannata (Cannata). Just after midnight, the officers heard multiple gunshots and proceeded to the area of Huron Street and Lotus Avenue to investigate. As they approached 627 North Lotus Avenue, they "saw***muzzle flashes" and heard more gunshots coming from the fenced-in backyard.

¶ 5        The officers exited their vehicle and surrounded the backyard. Pavone looked over the fence and Martino heard him yelling, "put the gun down, Chicago Police." As he was making his way over the fence, Martino heard Pavone shout "grab that guy running." Martino assumed that defendant had a gun but never saw one.

¶ 6        Martino chased defendant into the basement of the residence. Defendant "attempted to slam the door" on Martino, but the door "wasn't able to shut all the way." Martino detained defendant in the basement. A chrome .380 caliber semiautomatic handgun, .380 caliber spent shell casings and another gun were recovered in the backyard. Defendant made incriminating statements at both the scene and the police station. Pavone corroborated Martino's testimony, confirming that when he peered over the fence into the yard, he saw defendant "holding a chrome firearm up towards the air and it was jammed. He was manipulating the slide."

¶ 7        The trial court denied the motion to suppress, finding that the police officers, while on patrol "hear[d] gunshots***and saw muzzle fire" coming from the backyard, looked over the fence "and saw the defendant with a gun in his hand***defendant dropped the gun and ran into the house." The judge explained that "exigent circumstances" authorized the officer's pursuit of defendant into the house because he reasonably believed that a crime had been committed.

¶ 8                                        Bench Trial

¶ 9        Immediately after midnight on January 1, 2016, Peraino, Cannata, Pavone and Martino were on patrol when they heard multiple gunshots coming from the area of Huron Street and Lotus Avenue. As they approached 627 North Lotus, they heard more gunshots and saw muzzle flashes coming from the backyard, which was surrounded by a wooden fence. The officers immediately exited their police vehicle and approached the yard. From the alleyway, Peraino and Pavone looked over the fence, pointed their flashlights in the yard, and saw defendant holding a chrome handgun. The gun was "raised vertically toward the sky" and defendant was attempting to manipulate the slide. Pavone "jumped up on the fence" and announced, "Chicago police, drop the gun." In response, defendant dropped the gun and fled into the residence adjacent to the yard. On his way over the fence, Martino heard Pavone yelling "put the gun down" and shouting "grab that guy running." He chased defendant into the house and detained him in the basement of the residence. A "380 caliber chrome semiautomatic pistol," .380 caliber spent shell casings and another handgun were recovered in the yard. Before being transported to the police station, defendant volunteered "[t]hose are my guns. I live here. I take full responsibility."

¶ 10       Detective Ed Heerdt interviewed defendant at the police station. After receiving *Miranda* warnings, defendant stated that he was "out in the yard with some family members***that it was New Year's and that they had guns." He admitted that "at some point in time he discharged the

weapon, what he believed was four times, straight up in the air in celebration of the New Year's." When the police arrived, defendant dropped the gun on the ground and ran into the house.

¶ 11    Defendant testified that he lived at 627 North Lotus Avenue with his family. On New Years Eve, he was drinking and celebrating in the backyard with his two cousins and uncle. A couple of minutes into the new year, one of his cousins fired shots into the air. "It was a lot of shooting going on. It was the New Year." Defendant claimed "the other people in the backyard [fired] guns," but he never "fired" or "possessed" a gun. Shortly thereafter, he "heard the crash *** like a thud, [ ] you know how like you break a gate? *** And then [he saw] something in all black jump like up, and then [he] ran." No one announced "police."

¶ 12    Defendant ran into the basement, followed by someone who "broke [his] door down," and told him "to get down on the ground with a gun in his hand." He did not realize it was the police until he was brought back into the yard. Defendant denied admitting the guns were his in the backyard or at the police station. He told the detective he "wanted [his] lawyer present."

¶ 13    Based on the "credible testimony" of the police officers and the detective, the trial court found defendant guilty of the offenses of armed habitual criminal and unlawful use or possession of a weapon by a felon, and not guilty of reckless discharge of a firearm. Defendant was sentenced to the minimum term of six years' imprisonment.

¶ 14                                ANALYSIS

¶ 15                    Motion to Quash Arrest and Suppress Statements

¶ 16    Defendant first argues that the trial judge erred in denying his motion to quash arrest and suppress statements because the "officers who conducted the search and seizure had no warrant, no probable cause, and no exigent circumstance."

¶ 17    When reviewing a ruling on a motion to quash arrest and suppress evidence, we apply a two-part standard of review. *People v. Holmes*, 2017 IL 120407, ¶ 9. Great deference is given to the trial judge's findings of fact and these findings will only be reversed if they are against the manifest weight of evidence. *Id.* We review *de novo* "the court's ultimate legal ruling as to whether the evidence should be suppressed." *Id.*

¶ 18    Both the United States and Illinois Constitutions protect individuals against unreasonable searches and seizures. U.S. Const., amend. IV; Ill. Const. 1970, art. I, § 6. "An arrest executed without a warrant is valid only if supported by probable cause." *People v. Grant*, 2013 IL 112734, ¶ 10. "Probable cause exists where an arresting officer has knowledge of facts and circumstances that would have led a reasonable person to conclude the defendant has committed or is committing a crime." *People v. Jones*, 215 Ill. 2d 261, 273-74 (2005) (citing *Brinegar v. United States*, 338 U.S. 160, 175-76 (1949)). Whether probable cause exists depends on the totality of the circumstances at the time of the arrest. *People v. Wear*, 229 Ill. 2d 545, 563-64 (2008).

¶ 19    Here, the totality of circumstances constituted probable cause to believe that defendant had recklessly discharged and was openly displaying a firearm in his backyard. Contrary to defendant's claim, the officers did not "merely observe[] the defendant possessing a weapon after hearing gunshots." In addition to hearing multiple gunshots and seeing muzzle flashes coming from the backyard, the officers observed defendant pointing a gun "towards the air" "while manipulating the slide" and fleeing into the basement of the residence after being ordered by police to "drop the gun." *People v. Jones*, 196 Ill. App. 3d 937, 956 (1990) (defendant's flight after seeing the police can be a factor to consider in determining probable cause). Based on these facts, there was probable cause for the officers to believe that defendant had and was engaged in

criminal conduct at the time he was pursued into the residence. See *Grant*, 2013 IL 112734, ¶ 11 (probable cause "is governed by commonsense considerations, and the calculation concerns the probability of criminal activity, rather than proof beyond a reasonable doubt"); *People v. Collins*, 214 Ill. 2d 206, 216, 222 (2005) (firing a gun numerous times into the air constitutes endangering the bodily safety of another individual for reckless discharge of a firearm conviction); *People v. Watkins*, 361 Ill. App. 3d 498, 501 (2005) (where the "evidence showed that the defendant repeatedly fired a gun into the air in a residential neighborhood***the State proved the second prong of [reckless discharge of a firearm] beyond a reasonable doubt").

¶ 20        Defendant, relying on *People v. Horton*, 2019 IL App (1st) 142019-B, argues that "the mere observation of a gun absent the evidence of criminal activity could not provide probable cause to arrest." In *Horton*, the officer had a "*hunch* that the metallic object might be a handgun," but there was no other evidence that the defendant was engaged in criminal conduct at the time he was pursued into a residence and detained. (Emphasis added.) *Id.* ¶¶ 14-17, 62, 76. In this case, Pavone and Peraino unequivocally testified that after hearing multiple gunshots and seeing muzzle flashes coming from the backyard, they looked over the fence and observed defendant openly pointing a chrome handgun in the air before dropping the gun and fleeing from the police. "Illinois does not allow for open carry of firearms," or for the open discharge of a firearm in a residential area. See *People v. Balark*, 2019 IL App (1st) 171626, ¶ 58; see also *People v. Thomas*, 2019 IL App (1st) 170474, ¶ 40 (the totality of the circumstances suggested criminal activity where "mere gun possession was not the scenario that presented itself to the police in this case."). The facts known to the officers at the time of defendant's arrest surpassed "mere gun possession" and constituted probable cause to arrest.

¶ 21       Defendant also argues that even if the officers had probable cause to arrest, "there were no exigent circumstances to allow forcible entry into his home" because he "was never in a public space for hot pursuit to commence." "Generally, a warrantless and nonconsensual entry into a suspect's home to make an arrest is prohibited by the fourth amendment, even with probable cause." *Wear*, 229 Ill. 2d at 567 (citing *Payton v. New York,* 445 U.S. 573, 586–87 (1980)). But under the fourth amendment, officers may enter "a home without a warrant if exigent *** circumstances justify the entry." *People v. Foskey*, 136 Ill. 2d 66, 74 (1990); see *Sparing v. Village of Olympia Fields*, 266 F.3d 684, 688 (2001). Exigent circumstances exist "where police are in 'hot pursuit' of a suspect who flees from a public place into his residence." *People v. Hunley*, 313 Ill. App. 3d 16, 25 (2000); see *United States v. Santana*, 427 U.S. 38, 43 (1976) ("a suspect may not defeat an arrest which has been set in motion in a public place *** by the expedient of escaping to a private place"); *Wear*, 229 Ill. 2d at 567-68 (same).

¶ 22       Defendant claims that the doctrine of "hot pursuit" is inapplicable because "the warrantless arrest *** was initiated while [he] was inside the curtilage of his home rather than in public." In *Santana*, 427 U.S. at 42, the court recognized that "while it may be true that under the common law of property the threshold of one's dwelling is 'private,' as is the yard surrounding the house, it is nonetheless clear that under the cases interpreting the Fourth Amendment*** '[w]hat a person knowingly exposes to the public, even in his own house or office, is not a subject of Fourth Amendment protection.' " (citing *Katz v. United States*, 389 U.S. 347, 351 (1967)). In addition, a "public place" includes areas where an individual is "as exposed to public view, speech, hearing, and touch, as if [he] had been standing completely outside [his] house." *Santana*, 427 U.S. at 42-43; see *California v. Ciraolo*, 476 U.S. 207, 213 (1986) ("Nor does the mere fact that an individual has taken measures to restrict some views of his activities preclude

an officer's observations from a public vantage point where he has a right to be and which renders the activities clearly visible.").

¶ 23    We recognize that whether a private area can be considered "a public place" is a fact specific inquiry. It is not disputed that a fenced-in backyard is part of the constitutionally protected "curtilage" of the home. See *People v. Pitman*, 211 Ill. 2d 502, 516 (2004) ("[F]ourth amendment protection extends to a home's curtilage, *i.e.*, the land immediately surrounding and associated with the home."). This protection is not unlimited because, as noted, " '[w]hat a person *knowingly exposes* to the public, *even in his own house or office*, is not a subject of Fourth Amendment protection.' " (Emphasis added.) *Santana*, 427 U.S. at 41 (citing *Katz*, 389 U.S. at 351). Thus, under certain circumstances, a private area within the curtilage of the home may be deemed "public" for purposes of the hot pursuit doctrine, as we saw in *Santana*.

¶ 24    In this case, defendant's backyard, albeit fenced-in, did not "preclude [the] officer's observations from a public vantage point where [they had] a right to be and which render[ed] the activities clearly visible." See *Ciraolo*, 476 U.S. at 213. From the alley outside the yard, the officers heard gunshots and saw muzzle flashes. Moments later, they observed defendant pointing a handgun in the air and fleeing after being ordered to drop the gun. See *id.* ("That the [backyard] is within the curtilage does not itself bar all police observation"); *Village of Olympia Fields*, 266 F. 3d at 690 (the guiding considerations involve the fourth amendment privacy interest and not the common law of property); *Thomas*, 2019 IL App (1st) 170474, ¶ 45 ("where the offense can be said to have been committed in the presence of an officer, it has generally been held that the officer may enter the premises without a warrant for the purposes of making a warrantless arrest"). Here, the police reasonably believed that defendant had just fired a handgun into the air and saw him displaying a gun in a residential area. See *People v. Segoviano*, 189 Ill.

2d 228, 244 (2000). Therefore, under the "hot pursuit" doctrine, the police were justified in immediately pursuing defendant as he fled from the backyard of the residence to avoid arrest. The trial court did not err in denying defendant's motion to suppress evidence. In any event, as discussed below, the evidence against defendant was overwhelming, even without his incriminating statements.

¶ 25        Even assuming, *arguendo*, that the hot pursuit doctrine is inapplicable here, exigent circumstances existed where, after seeing muzzle flashes and hearing gunshots coming from the backyard of the residence, the officers "reasonably believed that a felony was being committed in their presence" (as discussed, officers had probable cause to believe defendant had recklessly discharged a firearm). See *People v. Eichelberger*, 92 Ill. 2d 359, 369 (1982) ("An offense is committed in an officer's presence when knowledge of the commission of an offense is acquired through any of his senses. It is not restricted to cases where knowledge thereof is provided by the officer's sense of sight."). This reasonable belief demanded "prompt police action and constituted an exigent circumstance which justified the warrantless entry***and the arrest." See *id.* (holding that the warrantless entry into the defendant's hotel room to effectuate an arrest was warranted by exigent circumstances where officers "reasonably believed that a felony was being committed in their presence"); see also *Thomas*, 2019 IL App (1st) 170474, ¶ 45 ("Given that defendant's actions provided police with probable cause to believe he was committing a felony in their presence, the officers rightfully entered defendant's alleged apartment unit to make a warrantless arrest.").

¶ 26                                Sufficiency of Evidence

¶ 27        Defendant argues that the State did not prove him guilty beyond a reasonable doubt of being an armed habitual criminal because "[n]o evidence of a gun, photo of a gun, or inventory

sheet was produced at trial" and the "only evidence against the defendant is that two officers, while propping themselves up over a fence, using a flashlight, saw the defendant holding what appeared to be a chrome handgun."

¶ 28    When reviewing a challenge to a criminal conviction based on the sufficiency of the evidence, "this court will not retry the defendant." *People v. Swenson*, 2020 IL 124688, ¶ 35. Instead, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Emphasis in original). *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Swenson*, 2020 IL 124688, ¶ 35. In this case, "the answer to that question is yes." See *People v. McLaurin*, 2020 IL 124563, ¶ 32.

¶ 29    A person commits the offense of being an armed habitual criminal when "he***possesses***any firearm after having been convicted a total of 2 or more times" of certain enumerated qualifying offenses. 720 ILCS 5/24-1.7(a) (West 2016). In *McLaurin*, 2020 IL 124563, ¶¶ 8, 21-38, the court held that the evidence was sufficient to support an armed habitual criminal conviction where no firearm was introduced into evidence, but a single officer "testified 'clearly and plainly and without impeachment that she saw a firearm, and that the defendant was the person holding that firearm.' " *Id.* ¶ 36. Similarly, in the instant case, Pavone and Peraino testified "clearly and plainly, and without impeachment" that they observed defendant pointing a chrome handgun in the air in his backyard moments after hearing gunshots and observing muzzle flashes coming from the yard. See *Swenson*, 2020 IL 124688, ¶ 36 ("[T]he testimony of just one credible witness is sufficient for conviction"); *People v. Wright*, 2017 IL 119561, ¶¶ 76, 77 (testimony from a single witness describing the firearm was sufficient to find that the defendant was armed with a firearm during the commission of the robbery). "Viewing

this evidence, as we must, in a light most favorable to the State, it was not so unreasonable, improbable, or unsatisfactory that no rational trier of fact could have found beyond a reasonable doubt" that the object defendant possessed was an actual "firearm." *McLaurin*, 2020 IL 124563, ¶ 38. Accordingly, we find that the evidence was sufficient to support defendant's conviction of the offense of armed habitual criminal.

¶ 30                                                    CONCLUSION

¶ 31            For the foregoing reasons, we find that the trial court properly denied defendant's motion to quash arrest and suppress statements and the evidence was sufficient to support defendant's convictions.

¶ 32            Affirmed.

¶ 33            JUSTICE HYMAN, specially concurring:

¶ 34            I concur in the court's judgment but write separately to emphasize two points. First, the State failed to meet its burden to show the existence of any exigent circumstances that could have possibly arisen out of Redmond's retreat into the home. Second, the facts strain the hot pursuit doctrine, as contemplated by *United States v. Santana*, 427 U.S. 38 (1976), to its maximum. In ordinary circumstances, a backyard shielded from public view by a six-foot privacy fence would not constitute a "public" place from which officers could lawfully initiate an arrest. Redmond, however, exposed his criminal behavior to public perception, which allowed officers to see muzzle flashes and hear gunshots from an area they were permitted to be. So, this case is unique, and should not be interpreted as extending the U.S. Supreme Court's understanding of hot pursuit.

¶ 35      Everyone agrees the officers had probable cause to believe Redmond committed a criminal offense when he discharged a firearm in the air. But what could the officers lawfully do next?

¶ 36      Warrantless arrests are presumptively unreasonable, needless to say, when they take place in the home. *Payton v. New York*, 445 U.S. 573, 587 (1980); see also *Florida v. Jardines*, 569 U.S. 1, 6 (2013) (for fourth amendment purposes "home is first among equals"). Officers armed with probable cause can enter the home without a warrant only under an exigent circumstance. *Welsh v. Wisconsin*, 466 U.S. 740, 749-50 (1984) (examples of exigent circumstances include hot pursuit, destruction of evidence, and an ongoing emergency like a fire). The State bears the burden of proving the existence of an exigent circumstance. See *People v. Eubanks*, 2019 IL 123525, ¶ 63; see also *Welsh*, 466 U.S. at 749-50 ("police bear a heavy burden when attempting to demonstrate an urgent need that might justify warrantless searches or arrests"). At oral argument, the State and members of the panel hypothesized about circumstances that might occur after Redmond fled into the home (escape, access to weapons stored inside, hostage situations). Nothing in the record supports these suppositions.

¶ 37      The State carries the burden of providing evidence of an exigency. Absent some kind of emergency or the chance that evidence might be destroyed, the only possible exigency implicated on these facts is hot pursuit. To justify a warrantless entry into the home under the hot pursuit doctrine, officers must have probable cause to arrest (undisputed here) and must set the arrest in motion in a public place. *E.g. People v. Davis*, 398 Ill. App. 3d 940, 951 (2010). A defendant who remains inside his or her home is not in public for purposes of hot pursuit. *Id.* at 952-53 (officers entered defendant's home without warrant after observing defendant, already inside his home, flee further inside). The area immediately surrounding the home (curtilage)

enjoys protection as part of the home. *Jardines*, 599 U.S. at 6-7. Redmond's backyard shielded by a six-foot privacy fence qualifies as curtilage.

¶ 38     At oral argument, we inquired about the difference between the privacy fence here and fences that offer little privacy (say, a chain-link fence). I would find a material difference between fences that "restrict[ ] access" and fences that also 'block visibility." See *United States v. Johnson*, 256 F.3d 895, 918-19 (9th Cir. 2001). Some courts have even suggested that the existence of a fence is irrelevant and, instead, ask "whether a public passerby would have been able to see [the defendant] in the backyard from the street." *Panarello v. City of Vineland*, 160 F.Supp.3d 734, 754 (D.N.J. 2016). At minimum, I would not entertain the State's argument that Redmond abandoned the privacy protections of his fenced-in backyard because officers could look over the fence on their tip toes or by lifting themselves. *Cf. United States v. Struckman*, 603 F.3d 731, 744 (9th Cir. 2010) ("anyone *** would be surprised at seeing a uniformed police officer peering at them inside their private, enclosed backyard from over the top of a six-foot fence.").

¶ 39     As we recognize, the inquiry under the Supreme Court's decision in *Santana* does not stop with a defendant's presence in an area that is typically afforded fourth amendment privacy protections. There, officers followed the defendant into her home after seeing her in the doorway. *Santana*, 427 U.S. at 40. The court acknowledged that the threshold of a home and the surrounding yard are "private" for fourth amendment purposes. *Id.* at 42. But the defendant "was not merely visible to the public but was exposed to public view, speech, hearing, and touch as if she had been standing completely outside her home." *Id.*

¶ 40     The question turns on intent: Did Redmond, by his actions, surrender his expectation of privacy in his otherwise-private backyard? See *People v. Hammerlund*, 939 N.W.2d 129, 137-38

(Mich. 2019). I agree that he did. Unlike *Santana*, the conduct drawing the officers' attention to Redmond's yard was not purely visual. Redmond fired a gun into the air necessarily exposing his conduct to public hearing. Officers also saw a muzzle flash before they peered over the fence, meaning Redmond exposed his conduct to public viewing as well. Redmond's visibility to the officers makes no difference. A person who wishes to maintain an expectation of privacy in his or her backyard does not voluntarily shoot a gun into the air from that location.

¶ 41        That is not to say that Redmond forfeited his expectation of privacy in his backyard by committing any criminal offense. If, for example, the officers had looked over Redmond's fence and saw him dealing drugs, this case would have had a contrary result. In that scenario, Redmond would not have knowingly exposed his unlawful activity to the public in any meaningful way. The officers, therefore, would not have initiated their arrest in a functionally public place which, in turn, would have rendered their entry into Redmond's home under the guise of "hot pursuit" unreasonable. Those facts are not before us and so, with some reservation, I join the court's judgment.

¶ 42        PRESIDING JUSTICE WALKER joins in this special concurrence.