NOTICE
This Order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2022 IL App (4th) 220240-U

NO. 4-22-0240

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
December 19, 2022
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Whiteside County |
| LONNIE P. SMITH, | ) | No. 20CM18 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Derek L. Hancks, |
| | ) | Judge Presiding. |

JUSTICE DOHERTY delivered the judgment of the court.
Justices Turner and Bridges[1] concurred in the judgment.

**ORDER**

¶ 1  *Held*:  (1) The State presented sufficient evidence to find defendant guilty of domestic battery and (2) defense counsel was not ineffective.

¶ 2  Defendant Lonnie P. Smith was convicted of domestic battery (720 ILCS 5/12-3.2(a)(1) (West 2018)) following a bench trial. On appeal, he argues that no rational trier of fact could find him guilty beyond a reasonable doubt based on the evidence presented at trial and that he received ineffective assistance of counsel. For the reasons that follow, we affirm.

¶ 3  I. BACKGROUND

¶ 4  In February 2020, the State charged defendant with two counts of domestic battery (*id.* § 12-3.2(a)(1), (a)(2)), two counts of battery (*id.* § 12-3(a)(1), (a)(2)), and one count of

---

[1] Justice George Bridges participated in this appeal but has since retired. Our supreme court has held that the departure of a judge prior to the filing date will not affect the validity of a decision so long as the remaining two judges concur. *Proctor v. Upjohn Co.*, 175 Ill. 2d 394, 396 (1997)."

harassment by telephone (*id.* § 26.5-2(a)(2)). These charges all resulted from an incident with Emily Hutchison, his paramour at the time. Defendant opted for a bench trial.

¶ 5 At trial, the State presented the testimony of Jordan Bush, Emily Hutchison, and Lori Hutchison. Bush testified that she witnessed an incident between Emily and defendant on August 17, 2019, approximately three weeks before the alleged battery. Bush arrived at a local bar with friends, and defendant was already there with Emily. Defendant left the bar and Emily followed. She returned a short time later, appeared upset, and could not find her cell phone. Emily and Bush were driven to defendant's home by another friend to see if defendant had the phone.

¶ 6 Initially, Emily went into defendant's home alone while Bush waited in the vehicle. After about 10 minutes, Emily returned to the vehicle and Bush then accompanied her inside defendant's home. Bush could not recall the conversation inside the house, but generally defendant was visibly upset that she was in his home. When Emily went to grab her phone charger, he reached out and forcefully grabbed her arm. Emily pulled back and defendant released her arm. After retrieving the phone charger, the two returned to the vehicle and drove back to the bar. Defendant reached out to Bush later that night via Facebook, stating that he had found Emily's phone and would bring it to the bar. Bush met him in the parking lot and retrieved the phone.

¶ 7 Emily testified that she was in a dating relationship with defendant from August through September 2019. She was familiar with defendant prior to their relationship because he was a local police officer. Referring to the incident on August 17, 2019, described by Bush, Emily explained that prior to arriving at the bar, she and defendant were at defendant's house having drinks together. Once at the bar, Jeremy, an ex-boyfriend, approached her, and they had a brief conversation. At the end of the conversation, the two hugged and went their separate ways. Defendant expressed to Emily his displeasure with this interaction and told her he was leaving.

- 2 -

She followed him out into the parking lot because she had put her cell phone in defendant's pocket. Defendant emptied his pockets in the parking lot, said he did not have the phone, and left. Emily believed that defendant had her phone and went with Bush to defendant's house to retrieve it. Once at the house, defendant was still upset and stated that Emily "needed to not speak to any other males" and threw a chair. Defendant hurled derogatory names at Emily. She said that she was leaving, and defendant aggressively grabbed her arm, stating she could not leave. Defendant also stated that if he saw the ex-boyfriend again "his beard would be full of blood." She pulled her arm away from defendant, left the house, and returned to the bar. Defendant later came back to the bar to give Emily her phone. He said he found it in the bushes of the parking lot across from the bar.

¶ 8        Emily then testified to the events leading up to the domestic battery. On September 5, 2019, the day before the incident, she went to a relative's funeral. Defendant came to the visitation to check in on her. The two made plans to host her family, including her mother, for dinner at defendant's house that evening. Following dinner, Emily went home and grabbed personal items to spend the night at defendant's house. After returning to defendant's home and getting "comfortable," she realized that she had forgotten her phone charger in the car and went out to retrieve it. When she returned, defendant confronted her, stating he went through her phone and saw that she was talking to an ex-boyfriend, Mitch. Emily explained that Mitch reached out because he knew the deceased relative and was conveying his condolences. Mitch and Emily expressed that they missed each other in the messages, and defendant took exception to that exchange, categorizing it as "cheating." A verbal argument followed, and defendant called Emily a "whore" and a "terrible person," stating others had told him that she "was like this." He demanded that she never speak to any males outside of her family. After an hour and a half of arguing, at approximately 10:30 p.m., Emily expressed her desire to leave and go home. When she

stood up to leave, defendant blocked the exit, stating that she could not leave because she "was just going to go back to [her] ex's." Defendant had been drinking alcohol throughout the evening and appeared intoxicated. Emily sat back down on the couch, as she did not feel she would have been able to get past him to exit the residence due to his size and strength. The verbal argument continued. Around 2:30 a.m. on September 6, 2019, Emily again attempted to leave. She was sitting on the couch with her legs pulled to her chest in a "pseudo fetal position." After hearing Emily was going to leave, defendant stood up from the couch, put his hands on her shins, and exerted force downward, pushing her into the couch, squeezing her legs, and causing her pain. She also felt insulted by defendant's actions. She told him to let her go and he removed his hands from her legs. He began pacing the living room and she again tried to walk out the door, but defendant blocked her from leaving by placing himself between her and the door, stating she could not leave.

¶ 9         Emily tried to go to sleep after several failed attempts to leave the residence. However, defendant came into the bedroom sporadically to continue the previous argument, asking why she thought other men were better than him and why he was not good enough. Defendant also continued consuming alcohol throughout the night. At approximately 4:30 a.m., Emily again attempted to leave, but defendant prevented her from doing so. She did not believe another attempt to leave the home by force or running to another exit would have been successful. Emily locked herself in a bathroom with her phone. Defendant unlocked the door with a screwdriver and continued the argument. She did not attempt to contact anyone because she was told that if she texted a friend, they would end up stuck in the house with her. She did not call 911 because defendant was a police officer, and the attempt would have been "unsuccessful." Finally, between 10 and 11 a.m., Emily was allowed to leave the house after advising defendant that she had appointments to keep.

¶ 10        After leaving the house, Emily returned to her mother's home to shower and get ready for the day. She explained what took place at defendant's house to her mother and asked her mother to contact authorities because she felt uncomfortable doing so. During the rest of the day, defendant attempted to contact Emily multiple times. She described a conversation wherein defendant expressed dismay that she was having doubts about the relationship because he was on his way to purchase an engagement ring for her. Emily ended the relationship with defendant during that conversation; in response, defendant stated there was a semi driving towards him and that he was planning on swerving in front of it. Following this conversation, defendant called Emily more than 20 but less than 50 times and sent numerous text messages throughout the day.

¶ 11        Eventually, Emily made contact with Brian Melton, the chief of police of the Morrison Police Department. Melton stated that he would initiate an internal investigation into defendant's actions but that the criminal investigation would be turned over to someone outside of the department. One week after the incident, Jarrod Johnson, a special agent for the Illinois State Police, interviewed Emily and photographed the bruises on her legs from where defendant had placed his hands to stop her from leaving. Those photographs were entered into evidence. The State also entered into evidence text messages extracted from Emily's phone. Emily read a portion of the messages from defendant aloud: "I love you Emily. Please forgive me. I know where I went wrong, believe me I really do. Please forgive me Emily. I really do. I blame me. I would give anything to have you on my lap again. I am sorry. I miss you Emily." The messages also included numerous photos of engagement rings and statements including: "Hi. See me. I see you." "I see you" "He is scum." "I am better then [*sic*] him." "I have photos. Sending to you [*sic*] mom." "Going to knock on your moms [*sic*] door." Following the interview with Johnson, she had no contact with defendant and did not send him any messages.

¶ 12    On cross-examination, defense counsel focused on the fact that Emily did not attempt to call her friends or authorities during the time she alleged defendant was keeping her captive. Even after leaving defendant's house, she did not contact authorities but instead went about her day and expected her mother to contact authorities on her behalf. Emily and a friend prepared for an evening out and later visited three bars, having at least one drink at each. Counsel also questioned whether Emily could have gotten the bruises on her legs from her employment. Emily testified she cared for a paraplegic individual and would assist him in and out of bed. However, the equipment used to care for the individual would not have been at the proper height to cause the bruising on her shins.

¶ 13    Lori Hutchison testified and recalled eating dinner at defendant's house following a relative's funeral. During dinner her daughter would say something, and she would notice that defendant would get a look on his face that indicated that he "was kind of mad about something she said." Lori stated that the next time she saw her daughter, she looked tired and upset. Emily said she wanted to come home, but defendant would not let her leave and blocked the exit when she tried to leave. Lori contacted the wife of a local police officer for assistance in reporting the matter. She was directed to Brian Melton, the chief of police of the Morrison Police Department. Throughout the day, defendant constantly attempted to contact Emily. Lori knew it was defendant because he had a certain ringtone on Emily's phone and the calls were nonstop. Lori recorded one of the phone calls with defendant. During that call, defendant asked Emily if she was with one of her former boyfriends and stated, "I don't want to do what you are making me do. Be here in 5 minutes or else." Lori also saw the bruising on Emily's legs a day or two following the incident, and Emily indicated the bruises were from defendant placing his hands on her.

¶ 14    Defendant testified in his case-in-chief. Defendant testified that he had been in law enforcement since 2002. He confirmed that on August 17, 2019, he was with Emily at a bar. He was talking to a friend when he turned and saw that "she had her arms around another male." He went over to her and said he was going home. He went home and a short time later, Bush and Emily arrived at his house uninvited, looking for Emily's phone. She had given him her phone to hold onto earlier in the night, but he did not have it when they arrived at his house. He denied throwing things in the house while Emily was there. After Bush and Emily left, he retraced his steps and found the phone next to a shrub where he parked his vehicle while at the bar. He thought it fell out of his pocket when he retrieved his keys. Once he found the phone, he contacted Bush and gave it to her.

¶ 15    Regarding the night of the alleged incident, defendant invited Emily's family over for dinner following the funeral on September 5, 2019. He cooked dinner for the family and had three or four drinks containing alcohol during dinner. He stopped drinking after dinner because he was full and had to work the next day. He denied that he was intoxicated that evening. Following dinner, Emily left to gather personal items to stay the night at his house. When she returned, she was sitting on his couch giggling while messaging with someone on her cell phone. He asked whom she was messaging, and Emily stated that she was messaging her ex-boyfriend and they were "telling each other how much they missed each other." He asked Emily to leave, but instead she went into his bedroom. He denied preventing her from leaving the residence. In an attempt to reconcile, Emily attempted to sit on defendant's lap, and he put his hand up to prevent her from doing so. He also explained that at the time he was in between surgeries on his right arm to remove bone spurs from his elbow. It was painful for him to exert force using his right arm and it would

- 7 -

"lock up" on him if he attempted to do so. After he rejected Emily's attempt to sit on his lap, she returned to the bedroom.

¶ 16           Later, Emily went to the bathroom and remained there for an extended period of time. Defendant knocked on the door; he asked if he could enter, and Emily told him he could. He entered the bathroom through the unlocked door; he did not need a screwdriver to unlock it. The two had a short exchange about what she was doing in the bathroom before she returned to bed. Defendant eventually joined her in bed prior to 2:30 a.m. He went to sleep and awoke the next morning to Emily telling him that she had a hair appointment to go to. He walked her to the door, and she left the house around 8 or 9 a.m. He denied grabbing Emily by the legs or that he prevented her from leaving the house.

¶ 17           Defendant admitted that he attempted to contact Emily numerous times on September 6, 2019. He disputed Emily's testimony that she broke up with him. He claimed that he terminated the relationship but changed his mind and was trying to get her to engage in conversation to repair the relationship. In reviewing the messages he sent her, counsel noted that he admitted he had done something wrong. Defendant clarified that "I probably got more upset than I should have" when Emily told him she was texting an ex-boyfriend.

¶ 18           Counsel then asked whether Emily attempted to contact him after September 6, 2019. Defendant explained that Emily had called his phone, left him a voicemail, and sent him a message on Facebook. He had provided the voicemail to his counsel, but it was not preserved for trial as his cellular service automatically deletes messages after 30 days. Emily also viewed his Facebook profile 18 times after the incident. He received the Facebook message about a week before the trial, and it stated, "I bet you wish you would have never broke [*sic*] up with me now . . see you in court." At the end of the sentence, a smirking face emoji and exclamation marks

followed. Defendant stated that the message came from the Facebook account Emily used to communicate with him during their relationship and that a search of Facebook did not reveal another Emily Hutchison. The message indicated information that only the two of them would know. Counsel moved to have the message admitted into evidence. The State objected, arguing the message did not carry an indicium of reliability because of the blank profile picture with just a name associated with the message, making it unclear whether the message came from an imposter account. The court overruled the objection, finding a sufficient foundation had been laid.

¶ 19        Defendant then explained that he was trained in minimally intrusive methods of restraint, none of which involved grabbing someone by the shins and holding them down. Given the condition of his elbow at the time, he would not have been able to apply the required force to leave the bruising on both of Emily's legs. While he regretted the things he said to Emily when they were arguing, he never laid a hand on her.

¶ 20        On cross-examination, defendant denied forcefully grabbing Emily or preventing her from leaving the house. He broke up with Emily during a phone call on September 6, 2019, but almost immediately regretted the decision. In reviewing the text messages, he admitted he sent her 52 text messages without a response from her after the breakup. He acknowledged he called Emily 20 to 50 times on September 6, 2019. He vaguely recalled discussing purchasing an engagement ring for Emily but did not recall commenting that he was going to swerve into oncoming traffic. Essentially, everything Emily testified to after she arrived at his house to spend the night to the time she left was a lie. He acknowledged that the Facebook message did not bear Emily's profile picture; instead, it was blank. When asked if Emily's Facebook account had a profile picture, he stated that it did and that it was a photo of her and her current boyfriend. Finally,

despite the injury to his dominant arm he continued to work as a police officer for a year following the surgery.

¶ 21 The court found defendant guilty of the two counts of domestic battery and two counts of simple battery but not guilty of telephone harassment. The court found the testimony of Bush and Emily consistent and credible. The injuries Emily received were consistent with her testimony of how she was sitting on the couch and defendant's alleged actions. Emily's testimony was bolstered by Bush's testimony of defendant's jealous and angry reaction when he grabbed her by the arm. The court did not find defendant's testimony credible, finding that the repeated attempts to contact Emily after claiming he terminated the relationship were inconsistent. On the whole, the court found Emily's testimony "more consistent and more logical than the [d]efendant's." The offenses merged and the court sentenced defendant on the domestic battery charge (720 ILCS 5/12-3.2(a)(1) (West 2018)) to 24 months' probation.

¶ 22 This appeal followed.

¶ 23 II. ANALYSIS

¶ 24 Defendant argues that the court overlooked contradictions in Emily's testimony and that its findings were inconsistent with the evidence. He contends that Emily's testimony was unreliable and unbelievable, and that no rational trier of fact could find her testimony more credible than his; he argues that the State failed to present evidence sufficient to prove his guilt beyond a reasonable doubt. Defendant also alleges he received ineffective assistance of counsel where his attorney failed to directly confront Emily with evidence that supposedly shows she continued to seek contact with him after the incident. Essentially, both of defendant's arguments turn on the Facebook message allegedly sent by Emily to defendant prior to trial.

¶ 25 A. Sufficiency of the Evidence

¶ 26    "When a defendant challenges the sufficiency of the evidence, a reviewing court must determine whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *People v. Jackson*, 2020 IL 124112, ¶ 64. "All reasonable inferences are drawn in favor of a finding of guilt." *People v. Swenson*, 2020 IL 124688, ¶ 35. "The testimony of a single witness, if it is positive and the witness credible, is sufficient to convict." *People v. Smith*, 185 Ill. 2d 532, 541 (1999). "It is the responsibility of the trier of fact to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *People v. Leib*, 2022 IL 126645, ¶ 36. The determination of a witness's credibility is within the province of the trier of fact and, while not conclusive, its determination is entitled to great weight; we will reverse a conviction where the evidence is so unreasonable, improbable, or unsatisfactory as to justify a reasonable doubt of a defendant's guilt. *Smith*, 185 Ill. 2d at 542.

¶ 27    To sustain a conviction for domestic battery in this case, the State was required to show that defendant knowingly and without legal justification caused bodily harm to Emily. 720 ILCS 5/12-3.2(a)(1) (West 2018). Defendant only disputes the finding that he caused harm to Emily by grabbing her legs. The State presented sufficient evidence for the trier of fact to find defendant guilty beyond a reasonable doubt. In this case, the court was presented with two competing versions of what happened on the early morning of September 6, 2019. The court heard testimony from Emily that defendant placed his hands on her shins and squeezed, causing her pain and resulting in bruising. Photographic evidence of the bruising was submitted into evidence and corroborated her testimony. Bush testified to an incident where defendant angrily and forcefully reached out and grabbed Emily by the arm. Lori testified to the events following the battery and stated she saw the bruising on Emily's legs.

¶ 28    Defendant argues that the Facebook message supports his testimony that he ended the relationship and impeached Emily's testimony that she did not attempt to contact defendant after September 6, 2019. It is well-established that the trier of fact is not required to accept any possible explanation compatible with the defendant's innocence and elevate it to the level of reasonable doubt. *People v. Siguenza-Brito*, 235 Ill. 2d 213, 229 (2009). Further, it is for the fact finder to judge how flaws in part of the testimony impact the credibility of the whole, and a reviewing court will not reverse that judgment unless it is unreasonable in light of the record. *People v. Cunningham*, 212 Ill. 2d 274, 283 (2004). The Facebook message fails to demonstrate that Emily's account of what happened on the night of the offense was not credible given all of the other evidence in the case.

¶ 29    Defendant also claims that in failing to mention the Facebook message in its ruling, the court failed to consider the evidence in its determination. In ruling from the bench, the trial court stated that it had considered all the exhibits and evidence presented in this case. Necessarily, that included the Facebook message. Defendant has failed to advance evidence to contradict that assumption. "[E]ven though it may be desirable for the trial court to explain its decision, the court's election not to comment or its failure to specifically mention certain portions of the testimony does not permit a defendant on appeal to claim that those portions not mentioned played no role in the court's determination." *People v. Curtis*, 296 Ill. App. 3d 991, 1000 (1998). Even considering the Facebook message, the court found Emily's testimony more credible. See *Siguenza-Brito*, 235 Ill. 2d at 228 (noting a reviewing court will not reverse a conviction simply because the evidence is contradictory or because the defendant claims that a witness was not credible). The court found that the communications defendant sent to Emily reflected jealousy and an obsession with her that conflicted with his testimony. It was the province of the trial court to resolve any discrepancies in

the evidence. The evidence presented by the State is not so unreasonable, improbable, or unsatisfactory as to justify a reasonable doubt of defendant's guilt.

¶ 30                                B. Ineffective Assistance of Counsel

¶ 31        Defendant also alleges his counsel was ineffective by failing to confront Emily with the Facebook message during cross-examination. The State argues this was a matter of trial strategy, unassailable on appeal.

¶ 32        We review claims of ineffective assistance of counsel under the familiar two-prong framework set out in *Strickland v. Washington*, 466 U.S. 668 (1984). A defendant alleging ineffective assistance of counsel " 'must demonstrate that counsel's performance was deficient and that the deficient performance prejudiced the defendant.' " *People v. Veach*, 2017 IL 120649, ¶ 30 (quoting *People v. Domagala*, 2013 IL 113688, ¶ 36). "To establish deficient performance, the defendant must overcome the strong presumption that counsel's action or inaction was the result of sound trial strategy." *People v. Ramsey*, 239 Ill. 2d 342, 433, (2010). That is because, generally, matters of trial strategy are immune from claims of ineffective assistance of counsel. *People v. Smith*, 195 Ill. 2d 179, 188 (2000).

¶ 33        We agree with the State that counsel's decision to forgo confronting Emily with the Facebook message during cross-examination was a matter of trial strategy. See *People v. Sturgeon*, 2019 IL App (4th) 170035, ¶ 91 ("[W]hether and how to cross-examine the State's witnesses is generally a matter of trial strategy."). Counsel could have reasonably concluded that cross-examining Emily regarding the Facebook message would serve no purpose other than to allow her an opportunity to minimize the evidence and allow the State to strengthen its case on redirect examination. Defense counsel was likely attempting to avoid the scenario where Emily denied authoring the message. We are unable to fault counsel's approach.

¶ 34 Defendant is essentially complaining of the manner in which defense counsel decided to impeach Emily's testimony that she did not have contact with defendant following the incident. Again, by introducing the message through defendant, counsel avoided the potential pitfall of Emily either denying the message was from her, pointing out that the Emily Hutchison who sent the message did not bear the same profile picture as her Facebook profile, or Emily being able to minimize the impact of the message by explaining or giving context to the message. Counsel was able to impeach Emily's testimony that she did not attempt to contact defendant following the incident without allowing her to minimize the contents of the message or deny its authenticity. Counsel exercised his professional judgment in determining how to cross-examine Emily. See *People v. Pecoraro*, 175 Ill. 2d 294, 326-27 (1997). Those actions were matters of trial strategy and did not constitute ineffective assistance.

¶ 35                                III. CONCLUSION

¶ 36 For the reasons stated, we affirm the judgment of the trial court of Whiteside County.

¶ 37 Affirmed.