2023 IL App (3d) 200445

Opinion filed March 20, 2023

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2023

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the 10th Judicial Circuit, Peoria County, Illinois, |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | Appeal Nos. 3-20-0445, 3-20-0446 (cons.) |
| | ) | Circuit Nos. 19-CF-589, 19-CF-498 |
| ZAVEON R. MARKS, | ) ) | |
| Defendant-Appellant. | ) ) ) | Honorable Katherine S. Gorman, Judge, Presiding. |

_____

JUSTICE ALBRECHT delivered the judgment of the court, with opinion.
Presiding Justice Holdridge and Justice McDade concurred in the judgment and opinion.

_____

**OPINION**

¶ 1       Defendant, Zaveon R. Marks, appeals his conviction for first degree murder and unlawful possession of a firearm, arguing that the juvenile court erred in transferring his case to adult court, that he received ineffective assistance of counsel and incurred a due process violation when his attorney and the court allowed a biased juror to serve on his jury, that the State failed to prove him guilty beyond a reasonable doubt, and that the court failed to properly consider his youth and its attendant circumstances at sentencing. We affirm.

¶ 2                                        I. BACKGROUND

¶ 3        On June 13, 2019, the State filed a petition in defendant's juvenile court case, alleging that defendant had violated the terms of his probation for a class X armed robbery charge. In its petition, the State alleged that on June 12, 2019, defendant committed two counts of first degree murder (720 ILCS 5/9-1(a)(2), (3) (West 2018)) and unlawful possession of a firearm (*id.* § 24-3.1(a)(1)). Defendant was 14 years old.

¶ 4        In addition to the petition, the State also filed a motion to transfer defendant's case to adult court. The State argued in its motion that there was sufficient evidence that a grand jury could indict defendant of first degree murder and unlawful possession of a firearm, that he was on probation at the time of the offense, and that he was not participating in the juvenile programs available to him. The motion further alleged that defendant's actions were aggressive and premeditated. It described defendant's attempt to commit robbery and his shooting of the victim after discovering he had nothing to steal. It alleged that defendant shot the victim three times, causing his death. The State argued that the nature of defendant's conduct, his history, and other surrounding circumstances demonstrated a need for prosecution in adult court.

¶ 5        At the transfer hearing, the State called Detective Scott Hulse, who investigated the shooting and murder of Z.F. Hulse stated that he spoke to Z.F.'s girlfriend, T.B., at the scene, and she identified defendant as the shooter. Video surveillance also showed defendant and another male walking on the street behind Z.F. and T.B. prior to the shooting, seemingly following them. Defendant's mother confirmed that her son was depicted in the surveillance video. Hulse spoke with Doyle Nelson Jr., who, after initially giving a different story, admitted to Hulse that he was with defendant the day of the shooting and that they intended to rob two people. In addition, Nelson told Hulse he witnessed defendant shoot Z.F.

¶ 6        Hulse also testified that the shell casings from the shooting matched an April 9, 2019, shooting near defendant's residence. A witness told Hulse that Nelson used the firearm on April 9 and that he ran to defendant's residence afterwards. He further testified that videos and pictures retrieved from defendant's phone showed the firearm in defendant's hands approximately 90 minutes before the June 12 shooting. Defendant was shown wearing the same pants in the photos on defendant's phone as were seen on the surveillance video of defendant and Nelson in Z.F.'s proximity prior to the shooting.

¶ 7        Kevin Kennedy testified that he had been defendant's probation officer since March 2019, which was around the time defendant had first been adjudicated delinquent. He stated that defendant had a low risk-assessment score but also had multiple violations to the electronic monitoring conditions of his probation. Defendant continued to be in the presence of unapproved friends and continued to possess firearms. Only three months had elapsed before defendant had committed this serious crime while on probation. Further, Kennedy testified that there were no programs he was aware of that he believed could prevent defendant from committing other crimes.

¶ 8        Dr. Joel Eckert, a psychologist, testified that he interviewed defendant on multiple occasions and submitted defendant to intelligence and academic achievement testing. He testified that the results were inconsistent with one another. Defendant performed better on the academic tests than his intelligence testing predicted. Further, a review of defendant's school records did not match the results of the testing that he performed. Therefore, even though his intelligence testing showed defendant at the lower end of the borderline-impaired range, Eckert wanted another opinion on defendant's abilities. He stated, "[T]his is one of the most confusing cases that I've ever been asked to evaluate. I usually can eventually come to some kind of a

conclusion, but right now I can't state with a reasonable degree of professional certainty what my opinion is."

¶ 9        The juvenile court found probable cause existed that the allegations in the State's motion to transfer were true and that it was not in the best interest to proceed in juvenile court. It entered an order to transfer defendant's case to adult court.

¶ 10       The State later moved to reopen the transfer hearing to advise the court of the sentencing ranges for defendant's charges. A second transfer hearing was then conducted where the court took judicial notice of the transcripts of the prior hearing and heard from the State regarding sentencing. The court also allowed defendant to present evidence of his father's criminal history and the domestic violence that occurred in his home between his mother and stepfather. The court again found that probable cause existed to believe the allegations against defendant were true and that it was not in the best interests of the public to proceed in juvenile court.

¶ 11       In finding that the matter should be transferred to adult court, the court stated that it considered all the statutory transfer factors, including defendant's age, prior delinquent history, and seriousness of the offense. Of these factors, it placed greater weight on defendant's criminal history and the seriousness of the current charge. The court further stated that while there was evidence of domestic violence in the household, it did not believe defendant personally had been abused. It also considered defendant's mental health, physical health, and education. Regarding defendant's education and testing, the court noted that Eckert's testimony indicated that defendant may be on the lower end of testing scores, but that his scores did not indicate that he had any disabilities. The court further noted that Eckert expressed some concern regarding defendant's testing because his scores were not consistent with his school records and testing results.

4

¶ 12    The court stated that it believed that there was probable cause to believe defendant committed an aggressive and premediated crime and that he had been out looking for trouble, initially intending to commit a robbery. It also did not believe that defendant would meaningfully participate in any juvenile programs if he remained in juvenile court and that, for the security of the public, defendant's case should be transferred to adult court.

¶ 13    Defendant's case proceeded to jury trial in adult court on October 28, 2019. During *voir dire*, defense counsel asked Juror A, "Well, what about African Americans? Do you think they're more likely to commit crimes than whites?" Juror A responded, "Yes, it seems that way. You know? If you watch the news, you—yes." When the court questioned him, Juror A stated that he believed he could be fair and impartial during trial. He did not believe there was anything that he had not discussed with the court that would make the attorneys believe he could not be fair and impartial. Juror A also told the court he had not read or heard anything about the case prior to coming in for jury selection.

¶ 14    Defense counsel also asked the other jurors whether they believed "African Americans are more likely to commit violent crimes than whites?" Juror B responded that he did but he believed he could be fair and impartial. He also informed the court that he had read about the case in the newspaper that morning and had seen a clip about it on the news. After an off the record discussion, the court excused Juror B. Juror A remained on the jury.

¶ 15    At trial, Z.F.'s girlfriend T.B. testified that she witnessed defendant shoot Z.F. On June 12, 2019, she and Z.F. were walking to McDonald's when defendant and another male approached them. She only knew the two that approached them by the names on their social media pages. The other male checked Z.F.'s pockets. When he did not find anything, defendant pulled out a gun, shot Z.F., and ran off.

5

¶ 16      T.B. told officers at the scene she knew who shot Z.F. and showed them a photo from defendant's social media account. She also picked defendant's photo out of a photo array an officer showed her. She stated that she had picked defendant's picture out of the array because she recognized him as the male that shot Z.F. In court, T.B. identified the State's exhibit of a photo array as the one she viewed at the police station and again pointed to the photo of defendant, stating that he shot Z.F. She further identified defendant in court as the person who shot Z.F. On cross examination, T.B. testified that she told officers the person who shot Z.F. wore a black hoodie; however, video surveillance of the area showed defendant wore a white hoodie that day.

¶ 17      Detective Timothy Turner testified that he provided the photo array to T.B. on June 12. Her identification of defendant was video recorded at the police station. When Turner asked T.B. how she knew the person she identified in the photo array, T.B. said she identified the person who had the gun. On cross examination, Turner testified that the other photos included males fitting the physical description of the shooter, though he admitted that they all were upwards of 10 years older than defendant.

¶ 18      The parties stipulated to security video surveillance from the grocery store and learning center on the same street where the shooting took place, and those videos were shown to the jury. Officer Clinton Rezac testified that he watched the surveillance videos and was able to identify T.B. and Z.F. walking by at around 3:59 p.m. on the day of the shooting. He also saw two individuals following T.B. and Z.F. One individual was wearing a white hooded sweatshirt with red markings, while the other individual wore a dark-colored hooded sweatshirt. Rezac further testified that he was able to identify defendant as the person in the white sweatshirt and Nelson as the person in dark clothing.

6

¶ 19 Ashley Carter testified that, on June 12, she drove her son A.B. and Nelson to defendant's house to pick up defendant and then took them all to her mother's house. While they were at her mother's, the police came to the house and asked if defendant was there. A.B. and Nelson exited the house with their hands up, while defendant ran into the basement. She stated that these events occurred sometime after 4 p.m.

¶ 20 The jury found defendant guilty of first degree murder and unlawful possession of a firearm.

¶ 21 At the sentencing hearing, the court informed defendant that he was eligible to receive between 20 and 60 years' imprisonment and that the court had discretion to add, or decline to add, 25-years' to natural life imprisonment for the firearm enhancement.

¶ 22 The State called Samantha Coake to testify in aggravation. She testified that she was a developmental specialist at the juvenile detention center, where defendant was currently held. On January 21, 2020, defendant and several other juveniles at the center attacked Coake and other staff members. Coake testified that defendant hit her, causing a broken nose, broken cheekbone, and broken eye socket. Photographs of Coake's injuries were shown to the court.

¶ 23 The State also called Officer Matheson Wood, who testified that defendant took part in a robbery in January 2019. The victim identified defendant as the individual who, during the robbery, possessed the firearm, which defendant used to hit him in the face. Defendant also shoved a gun in his mouth, chipping teeth, and ordered him to strip naked.

¶ 24 In mitigation, defendant's mother, Taylor, testified that he was a good child until his biological father was incarcerated. She stated that when they lived with defendant's stepfather, the home situation was hard, due to domestic violence. Before Taylor removed him from the situation, defendant witnessed several violent incidents, and his stepfather often spoke negatively

7

to him. Taylor admitted that she could have done more to supervise defendant, but she was overwhelmed as a single mother.

¶ 25    Hulse testified that the casings from the April 9, 2019, shooting matched the casings recovered from Z.F.'s murder scene. Nelson was involved in the April 9 shooting. Hulse also testified that he found text messages on Nelson's phone, discussing the robberies and the plan to raise money to purchase more firearms.

¶ 26    Eckert testified that defendant was motivated, but he had issues with impulse control, as well as cognitive disabilities. He believed this was normal for defendant's age. Eckert opined that defendant's deficiencies were related to his maturity level and ability to consider risks and consequences. He acknowledged that defendant knew that he had done something wrong by shooting Z.F., as demonstrated by the fact that he attempted to flee from the police.

¶ 27    The superintendent of the juvenile detention center, Brian Brown, testified regarding benefits residents receive if they behave while at the center. Brown also testified that defendant had behavioral issues—namely, noncompliance with rules and multiple assaults on staff. He noted that defendant's behavior at the center got progressively worse after his trial ended.

¶ 28    Defendant's presentence investigation report (PSI) indicated that defendant was restrained numerous times in juvenile detention because he would fight peers and disobey officers. He was adjudicated a delinquent on January 31, 2019, for committing an armed robbery and was sentenced to 36 months' probation. He was still on probation when he committed the offense in this case. Defendant told the probation department that he committed the robbery because he was bored. Defendant was also adjudicated delinquent for an aggravated battery that he committed while in the juvenile detention center awaiting sentencing.

¶ 29        In reaching its sentencing decision, the court stated that it considered defendant's PSI, the evidence and arguments presented, and all statutory factors in aggravation and mitigation. It also considered defendant's age, schooling, development, upbringing, and criminal history. The court noted that defendant was 14 years old when the crime occurred but emphasized that Z.F. "died senselessly" and that crimes like defendant's must be deterred. It made an express finding that the defendant's pattern of behavior suggests an irretrievable depravity, permanent incorrigibility, or irreparable corruption beyond the possibility of rehabilitation. The court sentenced defendant to 20 years' imprisonment for first degree murder, with a 25-year add-on for the firearm enhancement, for an aggregate of 45 years' imprisonment.

¶ 30        Defendant filed a motion to reconsider, arguing that his sentencing violated the proportionate penalties clause of the Illinois constitution. Further, it argued that the court erred in finding defendant beyond the possibility of rehabilitation. After a hearing, the court stated that it considered all the factors noted in *Miller v. Alabama*, 567 U.S. 460 (2012), before imposing defendant's sentence. It noted that it considered defendant's age and attendant circumstances, including mental health and his actions while in the juvenile detention center. The court denied defendant's motion. Defendant appeals.

¶ 31                                II. ANALYSIS

¶ 32                         A. Transfer from Juvenile Court

¶ 33        Defendant's first claim on appeal is that the juvenile court erred by transferring his case to adult criminal court. The findings primarily disputed by defendant on appeal are the court's determination of defendant's history of abuse, mental health and education, and his willingness to participate in services. Specifically, defendant argues that the court improperly interpreted defendant's evaluations by Eckert as defendant manipulating the tests and that it erred in finding

9

that defendant did not have a history of abuse because the domestic abuse in the home was not directed at him.

¶ 34     In Illinois, a minor 13 years old or older may be prosecuted as an adult if the State files a motion requesting as such and if the juvenile court finds "that there is probable cause to believe the allegations in the [State's] motion are true and that it is not in the best interests of the public to proceed under [the] Act." 705 ILCS 405/5-805(3)(a) (West 2018). The simple recitation of the factors by the juvenile court is insufficient to affirm; the court must make findings regarding the factors on the record. *People v. Morgan*, 197 Ill. 2d 404, 428 (2001). However, on review, we will not reweigh the factors for juvenile court. We will only "determine if there was sufficient evidence in the record as to each statutory factor to support the transfer order." *People v. Moore*, 2011 IL App (3d) 090993, ¶ 21. Whether a case was properly transferred to adult court is reviewed for an abuse of discretion. *People v. Clark*, 119 Ill. 2d 1, 18 (1987).

¶ 35     When deciding whether to transfer a case to adult court, the court must consider the following statutory factors: the age of the minor; criminal history; history of abuse or neglect; mental, physical, and educational history; the seriousness of the offense; whether there is evidence of premeditation, serious bodily harm, or use of a deadly weapon; advantages to treatment; history of services and the minor's participation; and rehabilitative potential. 705 ILCS 405/5-805(3)(b) (West 2018). The court must give greater weight to the seriousness of the offense and the minor's criminal history. *Id.*

¶ 36     At defendant's transfer hearing, the juvenile court received evidence and heard arguments from both sides. Defendant relied upon Eckert's report and testimony to support his argument that he had a low IQ and cognitive disabilities. With respect to Eckert's report, the court observed that Eckert was not confident in his findings that defendant may have a cognitive

disability and that he would like another opinion. Further, Eckert stated that defendant's school testing showed higher scores. Where the facts relied on by the court for its findings are taken from the expert's own report and testimony, we cannot find that the juvenile court abused its discretion in evaluating defendant's mental health history.

¶ 37    Defendant also contends that the court failed to acknowledge defendant's history of abuse. Defendant resided in a home where domestic violence occurred, and he argues the court did not properly consider this factor because defendant himself was not a victim in the abuse. Contrary to defendant's argument, the juvenile court did discuss and consider the abuse in defendant's home. The court noted the situation in the home and acknowledged it could have had an impact on defendant. Ultimately, however, the court decided to place lesser weight on this factor than other statutory factors in part due to the abuse not being personally directed at defendant. The court did not abuse its discretion merely because it did not place as much weight to a relevant factor as defendant or this court might have wished.

¶ 38    Defendant acknowledges that the statute requires the juvenile court to place the most weight on the seriousness of the offense and defendant's prior record but still argues that the court gave these factors too much weight, causing it to reach the improper conclusion that defendant could not be rehabilitated in juvenile court. We find that the court placed the appropriate weight to these factors. See *id.* (in balancing the statutory factors, the juvenile court "shall give greater weight to the seriousness of the alleged offense [and] the minor's prior record of delinquency than to the other factors listed in this subsection"). At defendant's transfer hearing, the court emphasized that it must consider the nature of the offense and the fact that it was a violent murder. It further noted that defendant had a prior armed robbery offense for which he was still on probation when this offense occurred. Given the contents of the record and the

11

legislative intent to "give greater weight" to the seriousness of the offense and defendant's prior criminal history, we cannot find that the juvenile court abused its discretion in this regard. *Id.*

¶ 39    Finally, defendant contends that the court failed to consider his rehabilitative potential before moving his case to adult court. Defendant had a prior finding of delinquency for armed robbery, for which he received 36 months' probation. He committed the instant offense only months after sentencing and weeks after his electronic monitoring was removed. Defendant's probation officer also testified that defendant continued to be in the presence of unapproved individuals and possess firearms. Moreover, the probation officer did not believe there was a program available to defendant through the juvenile system that could rehabilitate him. We cannot say that the court acted improperly by stating he lacked rehabilitative potential given the evidence presented to the court.

¶ 40    We find that the court addressed each factor under the statute and provided its reasoning for its decision. Therefore, defendant cannot show that the court's ruling was arbitrary, fanciful, or unreasonable. See *People v. Sutherland*, 223 Ill. 2d 187, 272-73 (2006).

¶ 41                                    B. Jury Selection

¶ 42    Defendant next argues that the court, by not dismissing Juror A, violated his due process right to a fair and impartial jury. He further contends he received ineffective assistance of counsel when defense counsel allowed a clearly biased juror to serve on his jury.

¶ 43    Defendant is incorrect in his assertion that the court had a duty to *sua sponte* remove Juror A. The Illinois Supreme Court has expressly rejected such a duty. See *People v. Metcalfe*, 202 Ill. 2d 544, 555 (2002) (although the court is afforded the discretion to remove a juror *sua sponte*, it has no affirmative duty to do so). The court will only be found to have abused its

12

discretion in how it conducted *voir dire* upon a showing that the court's conduct "thwarted the selection of an impartial jury." *Id.* at 553.

¶ 44　　In this case, the court did not thwart the selection of an impartial jury. It did not restrict the scope of defense counsel's questioning, nor did it prevent counsel from using a peremptory challenge to excuse Juror A. Indeed, it allowed defense counsel to ask the very question at issue and excused another juror who answered the question similarly to Juror A. Thus, the court did not abuse its discretion.

¶ 45　　This does not end our inquiry because, as noted above, defendant next contends that defense counsel was ineffective for failing to remove Juror A for cause. A defendant claiming ineffective assistance of counsel must show that (1) counsel's performance was deficient and (2) that deficiency prejudiced defendant. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). To show deficient performance, defendant must demonstrate that counsel's representation fell below an objectively reasonable standard. *Id.* at 687-88. To establish prejudice, defendant must show that there is a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different. *Id.* at 694.

¶ 46　　Defendant challenges counsel's choices regarding jury selection. In general, defense counsel's conduct during *voir dire* involves matters of trial strategy. *Metcalfe*, 202 Ill. 2d at 562. Matters of trial strategy are "virtually unchallengeable" and not subject to scrutiny under *Strickland*. *People v. Palmer*, 162 Ill. 2d 465, 476 (1994). We cannot say that counsel's actions in this case were not strategic. Defense counsel did exercise challenges on other jurors, and defendant cannot overcome the strong presumption that counsel's choice not to challenge Juror A was the product of sound trial strategy. *Strickland*, 466 U.S. at 689.

13

¶ 47     Further, there is no evidence that Juror A was biased or that his inclusion on the jury prejudiced defendant. When taking his entire *voir dire* questioning into account, there is no unequivocal bias on Juror A's part. See *People v. Manning*, 241 Ill. 2d 319, 337 (2011). To the contrary, Juror A affirmatively stated that he believed he could be impartial if on the jury and would give defendant a fair trial. Without showing proof that counsel's decision to allow Juror A to remain on the jury was not a tactical or strategic decision, defendant cannot show counsel was deficient in his performance. *Strickland*, 466 U.S. at 687.

¶ 48     Even if deficient performance could be shown, defendant cannot show prejudice. The relevant question here is whether a reasonable probability exists that, without the error, the factfinder would have entertained a reasonable doubt of guilt. *Id.* at 695. Defendant has not shown that without Juror A on the jury, the verdict probably would have been different. Our comprehensive review of the evidence presented at trial leads to the conclusion that defendant did, in fact, receive a fair trial that resulted in a verdict worthy of confidence. Further, there is no reasonable probability that, but for counsel failing to challenge Juror A's placement on the jury, the result of the trial would have been different. Accordingly, defendant's ineffective assistance of counsel claim fails.

¶ 49                              C. Sufficiency of the Evidence

¶ 50     Defendant next argues that the State failed to prove him guilty beyond a reasonable doubt. He argues that the only evidence the State presented that could convict him was the eyewitness testimony, which was unreliable. Also, the only other evidence that linked defendant to the firearm was a photo with what the police believed was the murder weapon.

¶ 51     In a challenge to the sufficiency of the evidence, we will not retry defendant. *People v. Collins*, 106 Ill. 2d 237, 261 (1985). "[T]he relevant question is whether, after viewing the

14

evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Emphasis omitted.) *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). All reasonable inferences in favor of the State are allowed but unreasonable or speculative inferences are not permissible. *People v. Cunningham*, 212 Ill. 2d 274, 280 (2004). When the finding of guilt relies on eyewitness testimony, the reviewing court must decide whether, considering the record, the jury could reasonably accept the testimony as true beyond a reasonable doubt. *Id.* at 279. The decision to accept such testimony is entitled to great deference but is not conclusive. *Id.* at 280. "A conviction will be reversed only where the evidence is so unreasonable, improbable, or unsatisfactory that it justifies a reasonable doubt of the defendant's guilt." *People v. Belknap*, 2014 IL 117094, ¶ 67.

¶ 52  Considering all the evidence presented at trial, it is not unreasonable that the jury found defendant guilty. Defendant argues that the State's only real evidence against him is T.B.'s testimony, which was unreliable. However, the credible testimony of just one witness is sufficient for a conviction. *People v. Swenson*, 2020 IL 124688, ¶ 36. Further, the weight given to a witness's testimony and credibility and the reasonable inferences made from that evidence are all the responsibility of the jury. *People v. Milka*, 211 Ill. 2d 150, 178 (2004). Additionally, "contradictory testimony of a witness does not *per se* destroy [his] credibility ***, and it remains for the trier of fact to decide when, if at all, he testified truthfully." *Sparling v. Peabody Coal Co.*, 59 Ill. 2d 491, 498-99 (1974). Therefore, it was for the jury to determine whether T.B. was a reliable witness.

¶ 53  In this case, there is nothing in the record showing that the only reasonable inference is that the questionable parts of T.B's testimony make the whole unworthy of belief. Further, T.B.'s testimony is not the only evidence presented to the jury to allow them to reach this conclusion. In

addition to T.B.'s testimony, the State also presented other evidence to support a conviction, such as the photos and videos found on defendant's phone of him with a firearm, surveillance videos establishing that defendant was near the scene, and evidence of his behavior after the shooting when police found him. It is not unreasonable for a jury to have found defendant guilty beyond a reasonable doubt of both murder and unlawful possession of a firearm.

¶ 54                                    D. Sentencing

¶ 55        Last, defendant argues that his sentence should be reversed because he was sentenced to a *de facto* life sentence and the court failed to consider the proper factors as outlined in *Miller*, 567 U.S. at 479-80. Defendant argues that, because the court did not properly apply the *Miller* factors at sentencing, the matter should be remanded for a new sentencing hearing. Defendant also outlines several mitigating factors that he asserts the court did not consider.

¶ 56        A reviewing court will not alter a defendant's sentence without a finding of abuse of discretion by the circuit court. *People v. Stacey*, 193 Ill. 2d 203, 209-10 (2000); *People v. Jackson*, 375 Ill. App. 3d 796, 800 (2007). There is no abuse of discretion "unless [the sentence] is manifestly disproportionate to the nature of the offense." *People v. Franks*, 292 Ill. App. 3d 776, 779 (1997); see also *People v. Alexander*, 239 Ill. 2d 205, 212 (2010).

¶ 57        Defendant argues that his sentence violates constitutional provisions; however, the United States Supreme Court in *Miller*, 567 U.S. 460, along with its progeny, have already determined that it is not unconstitutional to sentence a juvenile to a life sentence, "if the trial court determines that the defendant's conduct showed irretrievable depravity, permanent incorrigibility, or irreparable corruption beyond the possibility of rehabilitation." *People v. Holman*, 2017 IL 120655, ¶ 46. The court may only make this determination after considering

16

the mitigating characteristics of youth. *Id.* These factors are referred to as the "*Miller* factors." *Id.* ¶ 45.

¶ 58 To prevail on a *Miller* claim, defendant must show that he was sentenced to a life sentence (or *de facto* life sentence) and that the sentencing court failed to consider youth and its attendant circumstances when imposing the sentence. *People v. Buffer*, 2019 IL 122327, ¶ 27. A *de facto* life sentence for a juvenile is any sentence of imprisonment longer than 40 years. *Id.* ¶ 41. Our legislature has further codified additional factors the court must consider for minors, such as defendant's age, outside pressures, family and home environment, potential for rehabilitation, circumstances of the offense, participation in offense, prior criminal history, and defendant's ability to participate in his own defense. 730 ILCS 5/5-4.5-105(a) (West 2018).

¶ 59 There is no dispute that defendant's 45-year sentence constitutes a *de facto* life sentence under *Buffer*, 2019 IL 122327, ¶ 41. Therefore, we turn to the question of whether the sentencing court properly considered defendant's youth and its attendant circumstances.

¶ 60 Reviewing the evidence and arguments presented at the sentencing hearing, we find that the court did indeed consider defendant's youth and its attendant circumstances when it sentenced him. At sentencing, the trial court stated that it considered the PSI, evidence, and statutory factors in aggravation and mitigation. It noted defendant's age, education, development, and the seriousness of the offense. The PSI also detailed defendant's criminal history, which included his delinquency adjudication for armed robbery, for which he was on probation when the instant offenses occurred. Defendant also acquired another delinquency adjudication for battery while awaiting sentencing for these offenses. Coake testified to the extent of the injuries she received when defendant attacked her in the juvenile detention center. The court stated that it took all this information into account when rendering its sentence.

17

¶ 61 While there are nine factors listed in section 5-4.5-105(a) of the Unified Code of Corrections (730 ILCS 5/5-4.5-105(a) (West 2018)) that the court must consider, it is not required to analyze each factor on the record before rendering its sentence. *People v. Blakes*, 2021 IL App (3d) 190063-U, ¶ 27. Simply because the court does not explicitly mention a sentencing factor does not mean it did not consider it as important or relevant. *Id.* Moreover, when mitigating factors are presented to the court, we presume it considered them, unless the record demonstrates that it did not. *People v. Jones*, 2019 IL App (1st) 170478, ¶ 54. Here, the circuit court had plenty of evidence of defendant's youth and attendant characteristics before it and made more than a passing mention of them. There is nothing in the record that indicates the court did not consider the mitigating factors defendant presented. To the contrary, there is every indication it considered all the mitigating evidence. Indeed, the court specifically stated that it considered all the *Miller* factors when reaching its decision. Therefore, the court substantially complied with the statute, and its sentence was not excessive. See 730 ILCS 5/5-4.5-105(a) (West 2018).

¶ 62                                          III. CONCLUSION

¶ 63 The judgment of the circuit court of Peoria County is affirmed.

¶ 64 Affirmed.

*People v. Marks*, 2023 IL App (3d) 200445

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Peoria County, Nos. 19-CF-498, 19-CF-589; the Hon. Katherine S. Gorman, Judge, presiding. |
| **Attorneys for Appellant:** | Shobha L. Mahadev and Lydette S. Assefa (Evan Binder, Nico Bringardner, Emma Costello, Jill Doherty, and Matthew McClure, law students), of Children & Family Justice Center, Bluhm Legal Clinic at the Northwestern Pritzker School of Law, of Chicago, for appellant. |
| **Attorneys for Appellee:** | Jodi Hoos, State's Attorney, of Peoria (Patrick Delfino, Thomas D. Arado, and Justin A. Nicolosi, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |