NOTICE
Decision filed 08/08/23. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2023 IL App (5th) 220342-U

NO. 5-22-0342

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Shelby County. |
| | ) | |
| v. | ) | No. 20-TR-291 |
| | ) | |
| BRIAR W. TRUE, | ) | Honorable |
| | ) | Martin W. Siemer, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE WELCH delivered the judgment of the court.
Justices Moore and Barberis concurred in the judgment.

**ORDER**

¶ 1    *Held*: The conviction of the trial court is affirmed where the evidence was sufficient for a rational trier of fact to find each element of the offense beyond a reasonable doubt and where the court did not abuse its discretion in sentencing the defendant to 364 days of incarceration.

¶ 2    This is a direct appeal from the circuit court of Shelby County. The defendant, Briar True, was convicted of driving 35 or more miles per hour above the speed limit. On April 26, 2022, the trial court sentenced him to 364 days of incarceration with day-for-day good conduct credit. The defendant now appeals, contending both that the evidence was insufficient to convict him and that the court abused its discretion in sentencing him to 364 days of incarceration. For the reasons that follow, we affirm.

1

¶ 3                              I. BACKGROUND

¶ 4     On December 30, 2020, the State charged the defendant with one count of driving a vehicle upon an Illinois highway at a speed that was 35 miles per hour or more in excess of the applicable maximum speed limit, a Class A misdemeanor.  See 625 ILCS 5/11-601.5(b) (West 2018).

¶ 5     The charge stemmed from an incident which took place in the early hours of the morning on June 4, 2020.  The defendant was driving to work when he struck and killed a pedestrian, Sidney Manning, who was walking across the road.  Due to the force of the impact, Manning's limbs were separated from his body.

¶ 6     On June 16, 2021, this matter proceeded to a bench trial.  The State's first witness was Shelbyville police officer Joe Houk, who testified that on June 4, 2020, at 5:03 a.m., he was dispatched to the area of the Visitor's Center along Route 16 in Shelby County to investigate a car versus pedestrian crash.  Officer Houk testified that he arrived on the scene at around 5:05 a.m. and observed a white Oldsmobile with significant damage, including a large hole in the windshield.  The driver, the defendant, was outside the vehicle and appeared to be "very shaken up."  The defendant had blood splattered on his clothing but no injuries.  Officer Houk then searched for and found the victim's body on the roadway.  He informed the Illinois State Police (ISP) of the accident and, while he waited for them to arrive, proceeded to photograph and secure the scene.  He observed a hat, a wallet, two separate legs, and the rest of the victim's body in different spots along the roadway.  After looking inside the wallet, he was able to ascertain that the deceased victim was Manning.  Once ISP arrived, Officer Houk obtained a written statement from

the defendant, who stated that he had been traveling to work when he looked down at his car clock, saw that it was 4:50 a.m., and then looked back up to see the victim in the roadway. At this point, it had been too late to take any evasive measures, and he struck the victim with his car. The defendant told Officer Houk that he thought he was going approximately 50 miles per hour at the time of the crash.

¶ 7 The State's second witness was ISP trooper and accident reconstructionist Brian Scott. He testified that, at around 7:39 a.m. that morning, he arrived on the scene. He observed severe contact damage to the car's passenger side front bumper, hood, windshield, and roof, as well as a large amount of blood and biological matter on both the inside and outside of the vehicle. He specifically noted that there was a gaping hole in the windshield of the car. Trooper Scott identified the point of impact by examining the scene, graphing a cone of debris, and following those lines until their convergence point. Trooper Scott then measured the distance between the point of impact and the final rest point of the victim's body. This was done through the use of drone photos and a computer program and was determined to be approximately 259.97 feet. He testified to the lack of tire marks or other evidence of evasive steering on the scene. He testified that he spoke with the defendant, who related to him the same sequence of events that the defendant told Officer Houk.

¶ 8 As an expert in accident reconstruction, and based on his examination of the scene, Trooper Scott opined that the damage he witnessed was consistent with pedestrian crashes where the pedestrian "wraps up onto the vehicle and then strikes the windshield and hood." He additionally stated that "this was most likely a *** higher speed crash

3

than [he] had investigated before," and that "in doing the mathematical calculations," he determined that it was indeed a "higher *** speed crash situation." The equation Trooper Scott used to come to this conclusion was the Searle pedestrian throw equation, which was a method of calculating the speed of a striking vehicle as well as the speed at which a struck pedestrian was thrown from said vehicle. He testified that the Searle pedestrian throw equation was "the gold standard in pedestrian vehicle reconstruction crashes" and had been used in accident reconstruction for around 40 years.

¶ 9 Trooper Scott then walked the trial court through the process of applying the Searle pedestrian throw equation. There were two main factors that were needed to apply the equation—the first was the distance from the point of impact to the final rest point, and the second was the launch angle at which the body left the striking vehicle. There was also a "drag factor" for a pedestrian, which accounted for any friction or lack thereof the body experienced while traveling and which Trooper Scott testified was widely accepted in the reconstruction community to be 0.66. Additionally, there was a projection efficiency factor, which, for an adult, was widely accepted to be 72.6%. Trooper Scott explained this meant that an adult pedestrian's speed was usually only 72.6% of the striking vehicle's speed as an adult pedestrian usually did not absorb the full speed of the vehicle after being struck.

¶ 10 After determining the point of impact and the distance between that point and the final rest point, Trooper Scott needed to approximate the launch angle at which the victim's body most likely left the striking vehicle. Trooper Scott explained that, although many studies had shown that launch angles were usually very low, around 6 to 10

4

degrees, in accident reconstruction training, officers were advised to use between 10 to 20 degrees for their calculations in an effort to give the driver the benefit of the doubt.

¶ 11    Trooper Scott testified that, in the present case, he used the most conservative launch angle available to him, 20 degrees, in order to give the defendant the maximum benefit.    Trooper Scott concluded that the pedestrian left the defendant's car at approximately 61.59 miles per hour.   Using that number, Trooper Scott was able to conclude that the victim's speed of 61.59 miles per hour was approximately 72.6% of the defendant's car's speed upon striking the victim, or approximately 84.83 miles per hour. The possible speed range for the vehicle based on the Searle principle, according to Trooper Scott, was between 82 to 98 miles per hour.   Trooper Scott testified that these calculations were consistent with the damage he witnessed at the accident scene as well as the condition of the victim's body.    Finally, Trooper Scott confirmed that the defendant's vehicle could not have been traveling less than 80 miles per hour at the time of impact.

¶ 12    On cross-examination, the defendant's attorney questioned whether the Searle pedestrian equation adequately accounted for the possibility that the crash was not a "clean strike," or, in other words, that the vehicle could have carried Mr. Manning's body for a sufficient time for the body to assume the full speed of the vehicle.   Trooper Scott insisted that the only car versus pedestrian crashes that do not include "clean strikes" involve child pedestrians and high end vehicles, in which cases, the children can assume almost 100% of the vehicle's speed.   The defense attorney then questioned whether the "snow plow" shape of the vehicle's roof may mean that Mr. Manning's body became

"entrapped for a moment of time *** far higher than what Searle contemplated, such that the pedestrian velocity would have almost equaled the velocity of the vehicle." Trooper Scott insisted, however, that "the physical evidence *** debunked that scenario." Trooper Scott went on to testify that, had the body been carried, it would have "gone through the windshield and then inside the car and remained inside the car instead of being projected." He then reiterated that "given the physical evidence, [he was] of the opinion that [the victim] was almost immediately projected from the vehicle *** after striking," in a classic "clean strike" scenario.

¶ 13 The defendant's attorney then questioned whether the Searle equation accounted for the material of the vehicle, the clothing that the victim might be wearing, or even whether the body "bounced, skidded, slid, bounced multiple times, [or] rolled." Trooper Scott contended that all of those specific friction values were "all-encompassed in that 0.66" predetermined "drag factor" value. Since the Searle equation assumed that the pedestrian's body was intact, whereas, in this case, it was not, counsel asked Trooper Scott whether, because of its condition, the victim's body would "more closely resemble a child's body" and have a higher chance of achieving the same speed as the striking vehicle. Trooper Scott responded that this was not possible in his opinion. The defense attorney then questioned whether other factors, such as whether the pedestrian was lateral facing, whether the pedestrian was stationary, where on the vehicle the body was struck, and ground frictional characteristics, were taken into account. Trooper Scott responded that the Searle equation had "considered all those variables and came up with this drag

6

factor all-encompassing all of those factors" and that "in the scientific world and the world of crash reconstruction, these numbers [were] accepted by everyone."

¶ 14    Trooper Scott testified that he had seen multiple pedestrian crashes in his almost nine years of accident reconstruction work and had never seen a body in such severe condition. This was despite the fact that, in some crashes, he had gotten electronic data from the car which had told him how fast the car was driving at the time of the crash with the pedestrian, and in those cases, the damage to the pedestrians' bodies had not been so severe. Trooper Scott then testified that he had only seen five pedestrian-vehicle accidents, including the present case.

¶ 15    On redirect examination, Trooper Scott testified that the fact that the majority of damage was to the car's roof told him that the crash was a higher-speed one. He reiterated his professional belief that the victim was not carried by the vehicle for any significant amount of time. He also testified that the pattern of the blood spatter on the vehicle indicated that the body was first struck in the head and then was almost immediately projected forward. He added that it would be inconsistent with the evidence to say that the victim was carried by the vehicle for any significant period of time that would affect his speed estimate. The State then asked whether the computed speed would still come out to over 80 miles per hour if the estimated point of impact was moved up to the location of the first piece of debris (the victim's denim slacks with part of his leg) in order to give the most benefit of the doubt to the defendant. Trooper Scott answered that this was the case. Trooper Scott remained steadfast in his opinion that the victim was not carried by the vehicle for any significant amount of time.

7

¶ 16 The State then called its third witness, ISP master sergeant and accident reconstructionist Steven Coady. Master Sergeant Coady reiterated Trooper Scott's testimony on the basis of the Searle equation and that the equation was the "gold standard for pedestrian throw, pedestrian crash investigations." Master Sergeant Coady testified that, at approximately 5:50 a.m. on the morning of the crash, he was notified of the vehicle versus pedestrian crash and was assigned to investigate it along with Trooper Scott. In observing the scene, he first focused on the vehicle involved. His immediate opinion in observing the vehicle, based on his training and past experience, was that the vehicle had been involved in a high speed impact with the victim. He reviewed the findings that were made by Trooper Scott, as he was Trooper Scott's supervisor, against his own observations of the scene and understanding of the Searle equation.

¶ 17 Master Sergeant Coady then explained that the projection efficiency factor that Trooper Scott used in his calculations, 72.6%, was actually a conservative estimate very much in favor of the defendant. He further explained that this was because the vehicle was a "low front vehicle" that, according to Searle, when involved in a crash with an adult, would yield a projection efficiency factor of 64%. However, Trooper Scott used Searle's general projection efficiency factor for adults, 72.6%, which did not consider the vehicle type and thus was much more forgiving to the defendant. Master Sergeant Coady confirmed that, had Trooper Scott chosen to use the more accurate projection efficiency factor of 64%, the calculated speed of the defendant's car would have been higher. Master Sergeant Coady reiterated that, even the departure angle that Trooper Scott had

8

used in his calculations, 20 degrees, was "the most extreme, reasonable, conservative estimate" that could have been used.

¶ 18   Master Sergeant Coady then reaffirmed that the crash in question was, in his professional opinion, a "wrap projection," which meant that, after the vehicle struck the pedestrian, the pedestrian would wrap over the hood of the vehicle, interact a little with the windshield and the roof of the car, and then immediately separate from the car.  He reiterated that at this point this meant that the victim would not have been carried by the car for any significant period of time.  He also confirmed that, if the point of impact were moved up to the first location where it was practically certain that the victim had been struck, the location of his denim slacks and partial leg, the vehicle's speed would be decreased but would still come out to be greater than 80 miles per hour at the time of impact.  According to his calculations, the defendant's vehicle was traveling anywhere from 84 to 98 miles per hour at the time of the impact.  He thought it was "absolutely not" possible that the defendant's vehicle could have been traveling less than 80 miles per hour at the time of impact.  According to him, the defendant "could have been going faster, but he was not going slower."

¶ 19   On cross-examination, Master Sergeant Coady was asked why his calculation range differed from Trooper Scott's—where Trooper Scott had come up with anywhere from 82 to 98 miles per hour, Master Sergeant Coady had come up with anywhere from 84 to 98 miles per hour.  Master Sergeant Coady explained that there was no discrepancy in actuality because Trooper Scott's 82 miles per hour figure was based on a default Searle opinion using a 45 degree departure angle, a departure angle not possible in

9

reality. The defendant's attorney asked Master Sergeant Coady if it was possible that the victim's body had gotten caught in the windshield and been carried for longer than the Searle equation anticipated. Master Sergeant Coady answered, "that would be atypical of anything that I have ever experienced with a pedestrian strike." Master Sergeant Coady testified that the Searle equation was the only method he was taught in training. He also testified that, to the best of his knowledge, the Searle equation did not account for bodies with missing limbs.

¶ 20    The defense called the defendant's fiancée, Andrea Wendt, who testified that she and the defendant lived together with their daughter in Neoga, Illinois, and they were currently expecting a second child. Wendt testified that the defendant had worked at P&H Manufacturing in Shelbyville for the past three years, and he worked the 5 a.m. to 3:30 p.m. shift. Wendt testified that the defendant left their home every morning at 4:20 a.m. Wendt recalled that, on the morning of Thursday, June 4, 2020, the morning of the crash, the defendant did not appear rushed or leave the house late. Although she herself left the house that morning at around 5 a.m., she did not believe the defendant returned to the house to retrieve anything. The next time she heard from the defendant was around 5:30 a.m. when he called to inform her about the crash.

¶ 21    Wendt testified that she and the defendant had made the trip from Neoga to Shelbyville many times, and she was familiar with the route where the crash occurred. She testified that the defendant drove very carefully during that section of the route because they had seen deer cross there early in the mornings and because there had been multiple accidents in that area. She even recalled conversations between herself and the

defendant to this effect. She insisted that the defendant had never in his life driven near 80 to 85 miles per hour, and he did not have a problem with being late to work. Wendt testified that the usual driving time between the area where the crash occurred and P&H Manufacturing was around three minutes.

¶ 22 The defendant testified that his scheduled work hours the entire time he had been employed at P&H Manufacturing were from 5 a.m. to 3:30 p.m. On the morning of the crash, he woke up at around 4 a.m. He took a shower, got dressed, put his shoes on, and left at 4:20 a.m. Upon being shown a Google Maps printout of his route to work, he confirmed that the travel time between his home and his place of work was 30 minutes. He testified that, on the morning of the crash, he was not running late for work. He admitted that he was traveling a little over the speed limit, at 55 to 60 miles per hour. However, he testified that there was "no way" he was driving 84 miles per hour because he had never driven that fast on that road in his life.

¶ 23 The defendant then went into the details of his actions just prior to the crash. He testified that, as he got to a certain section of the road, he lifted his foot off the gas pedal and looked down at his car's clock. He saw that the time was 4:50 a.m. At this point, he was approximately two miles away from work and was not in danger of arriving late. He then looked back up to see the victim in front of him on the street but did not have time to stop the car or make any other evasive measures. He testified that, at no point did the victim look towards his vehicle, and that, to the best of his knowledge, the victim was unaware of the vehicle. Until just before the crash, he, too, was similarly unaware of the victim's presence on the road. Once the impact occurred, the defendant remembered the

11

victim's knees buckling and his body falling in a fetal position into the windshield. The defendant remembered that immediately after, something hit him in the head. A few seconds later, the victim's body "peeled off the top of [the] roof." The defendant was adamant in his testimony that the victim was not immediately thrown from the car upon impact.

¶ 24 The defendant testified that, after the victim's body peeled off the roof of the car, the defendant went into shock and pulled over to the first available spot off the highway. He recalled that both the interior of the vehicle as well as his own person were covered with blood and biological matter. He exited the vehicle and panicked for a while before trying to find his phone, which had been thrown to the floorboard during the crash. He called a friend from work and told him about the accident. This call lasted for about five minutes. The friend eventually calmed the defendant down enough for him to call 9-1-1. The defendant testified that he believed he called his friend prior to 5 a.m. because his friend was still in the office with their boss at the time of the call. According to the dispatch record, the defendant called 9-1-1 at 5:01 a.m. Finally, the defendant testified that he was certain he was driving only around 50 miles per hour when he struck the victim.

¶ 25 On cross-examination, the defendant confirmed that he did not apply the brakes or engage in any evasive steering before crashing into the victim. He testified that, even though he had his headlights on, it was dark outside at the time of the crash, and he could not see very much. He testified that he did not see the victim until the moment of impact and that the crash happened very fast. The State then asked the defendant whether he had

to arrive at his place of work, park in the parking lot, walk into the building, and clock into the time clock all before 5 a.m. The defendant confirmed that this was the case.

¶ 26 During closing arguments, the State emphasized its two expert witnesses' testimony that the Searle principle was the gold standard for vehicle-pedestrian crashes, and that, even according to the most conservative calculations, the defendant could not have been going under 80 miles per hour at the time of the crash. The State then pointed out that, "[t]here [was] no testimony to contradict either of [the expert witnesses'] opinions *** with regard to this crash reconstruction." The defense argued that, according to the Google Maps printout of the defendant's daily route to work, which "[took] into account the posted speed limits," the defendant was on track to arrive on time and was traveling under the speed limit.

¶ 27 The defense reiterated its theory that the Searle equation's results were inaccurate because the victim was caught in the windshield of the car and carried for longer than the equation anticipated. The defense also attacked the Searle equation's friction coefficient as insufficient to account for all the factors involved in car-pedestrian crashes. Lastly, the defense highlighted the lack of evidence, other than the experts' estimations and calculations. The trial court took the case under advisement.

¶ 28 On June 24, 2021, the trial court issued a written order finding the defendant guilty. In its order, the court specifically found "the testimony of Scott and Coady to be more credible and reliable than the testimony of [the] [d]efendant as to the issue of the speed of [the] [d]efendant's vehicle at the point of impact." On September 28, 2021, the

13

defendant filed a motion for new trial and/or to reconsider. On December 22, 2021, a hearing proceeded on the defendant's motion, and the motion was denied.

¶ 29    On April 26, 2022, the sentencing hearing was held. The State called one witness, Stacy Heselton, who testified that he was the late victim's son. Heselton testified that the victim had a habit of getting up every morning around 4 a.m. and crossing the road to walk on the other side for exercise. Heselton testified that the victim looked after his wife, who suffered from dementia. Heselton stated that, after the victim's death, his mother's mental health greatly deteriorated, and she passed away two months later. The State then read out two victim impact statements from the victim's granddaughters.

¶ 30    The defense called its first witness in mitigation, Dylan Smith, who testified that he worked alongside the defendant at P&H Manufacturing. He testified that the defendant was a hardworking employee and, to the best of his knowledge, had never had any disciplinary problems. Smith testified that both before and after the crash, the defendant and Smith would often meet up at one another's homes to have dinner while their children played together. Smith testified that the defendant was an active and involved father, and his family heavily depended on him financially and emotionally. Smith testified that at around 4:50 a.m. on the day of the crash, he received a call from the defendant, who was distraught and told him about the crash, which had just occurred. He testified that the defendant became greatly depressed after the accident and still had not fully recovered.

¶ 31    The defense then called its second witness in mitigation, Toby Hocq, who testified that he was the defendant's immediate supervisor at P&H Manufacturing. He testified

14

that the defendant was a "model employee" whom Hocq often trusted with extra responsibilities. Hocq did not recall ever having to reprimand the defendant for any reason. Hocq testified that it would be difficult for him if the defendant were away from work for an extended period of time.

¶ 32 The defense called Wendt as its final witness in mitigation. Wendt testified that she and the defendant had two children together, a three-year-old and a five-month-old. She testified that the defendant was a good father and that she relied on him to provide for their family financially. She testified that, if he were to be away from the family for an extended period of time, it would be "devastating to not have his support mentally, emotionally, and financially." She testified that she did not know how she would be able to work full time and afford daycare for her two children. However, both she and the defendant had family members in the area. She described the effect of the crash on the defendant as "crushing" and stated that he continued to struggle with his mental health.

¶ 33 After testimony, the State argued that the defendant should be sentenced to 364 days in jail, the maximum sentence of imprisonment allowable for a Class A misdemeanor. In its argument, the State noted that "the Illinois legislature has determined that when a driver is traveling at a speed as high as this defendant was traveling, that it warrants a maximum sentence of 364 days in jail." And, the State opined, "if this defendant has not earned a sentence based upon this offense, then I don't know what defendant would qualify for a 364-day jail sentence for a Class A speeding ticket." The defense asked that the trial court impose any sentence that did not involve jail time. The defendant thereafter made a short statement of allocution.

15

¶ 34   After hearing the arguments, the trial court explained that, in reaching its decision, it had considered the record, the circumstances of the case, and all statutory factors in aggravation and mitigation. The court listed the statutory factors it found relevant in mitigation: that the defendant did not contemplate that his criminal conduct would cause or threaten serious physical harm to another, that the defendant had led a law-abiding life for a substantial period of time before committing the present crime, that the defendant's character indicated that he was unlikely to commit another crime, and that his imprisonment would entail excessive hardship to his dependents. The court also listed the statutory factors it found relevant in aggravation: that the defendant's conduct caused or threatened serious harm, that he had a history of prior delinquency or criminal activity, and that a sentence may be necessary to deter others from committing the same crime.

¶ 35   The trial court commented that "it's fair to say that defendant's conduct did cause harm to another and that is an overriding factor for this Court's consideration." The court also took note of the fact that there were "a number of traffic offenses" noted in the presentence investigation report (PSI). According to the PSI and its addendum, the defendant had convictions for reckless driving, driving under the influence, improper traffic lane usage, depositing material on the highway, operating an uninsured motor vehicle, squealing and screeching his tires, and driving 15-20 miles per hour above the limit. The defendant also had four offenses for failing to carry his registration and four failure to appear warrants issued. However, the court remained "mindful of the factors in mitigation as well" and acknowledged that "[c]learly there will be hardships on the defendant and his family if sentenced to any jail time." In the end, the court found that "a

16

period of probation would deprecate the seriousness of the offense." The court then sentenced him to 364 days in jail, the maximum sentence of imprisonment allowable for a Class A misdemeanor, with day for day credit to apply and no credit for time served.

¶ 36 On May 10, 2022, the defendant filed an emergency motion to stay the sentence as well as a motion to reconsider sentence. On May 13, 2022, after a hearing, the trial court denied the emergency motion. On May 27, 2022, after a hearing, the court denied the motion to reconsider. During this hearing, the court commented that, although in the original sentencing hearing, it had been somewhat vague about the value of deterrence in this case, "in the end, *** a sentence [was] necessary to deter others." The court also explained that its comments during the original sentencing hearing on the factors it had found relevant were

> "to make clear that this Court had given consideration to all of the relevant factors in mitigation, but ultimately the weight to be given to those factors and to the factors in aggravation is to be determined by the Court. And this Court gave greater weight to the factors in aggravation, particularly the physical harm caused to another and the prior history of offenses committed by the defendant."

On May 31, 2022, the defense filed a notice of appeal.

¶ 37                                    II. ANALYSIS

¶ 38 On appeal, the defendant makes two contentions. First, he argues that the evidence in this case was insufficient to convict him of speeding 35 miles per hour or more in excess of the applicable speed limit. Second, he argues that his sentence of 364 days in jail was excessive. We disagree with both arguments.

17

¶ 39                    A. Sufficiency of the Evidence

¶ 40    The defendant was charged with driving a vehicle upon a highway of Illinois at a speed that was 35 miles per hour or more in excess of the applicable maximum speed limit, a Class A misdemeanor.  See 625 ILCS 5/11-601.5(b) (West 2018).  At trial, the only issue was the speed at which he was driving at the time of the crash.  The defendant claims that the evidence adduced at trial was insufficient to prove that his speed was 35 miles per hour or more in excess of the applicable speed limit.  We disagree.

¶ 41    "[T]he standard to be applied in reviewing the sufficiency of evidence in all cases, whether the evidence is direct or circumstantial [citation], is 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' "  (Emphasis in original.)  *People v. Ward*, 154 Ill. 2d 272, 314 (1992) (quoting *People v. Collins*, 106 Ill. 2d 237, 261 (1985)).  A reviewing court will not retry defendant.  *People v. Swenson*, 2020 IL 124688, ¶ 35.  This court will not "substitute its judgment for that of the trier of fact on issues involving the weight of evidence or the credibility of witnesses."  *People v. Siguenza-Brito*, 235 Ill. 2d 213, 224-25 (2009).

¶ 42    In a bench trial, great deference is given to the findings of the trial judge, who, as the trier of fact, "was in a much better position than are we to determine [witnesses'] credibility and the weight to be accorded their testimony."  *Id*. at 229.  Accordingly, following a finding of guilt, on review, all reasonable inferences in the record will be made in favor of the State.  *People v. Cunningham*, 212 Ill. 2d 274, 280 (2004).  So long as *any* rational trier of fact could have found guilt established beyond a reasonable doubt,

18

it is irrelevant on review whether the reviewing court itself believes such guilt was proven. See *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). However, this deference to the trial court only extends to reasonable conclusions; if a court's conclusion is unreasonable, and "only one conclusion may reasonably be drawn from the record, a reviewing court must draw it even if it favors the defendant." *Cunningham*, 212 Ill. 2d at 280.

¶ 43 In coming to our conclusion, we reject the defendant's contention that the evidence the State provided was insufficient because it lacked direct, physical evidence and instead relied on expert testimony. First, the defendant himself stipulated to the experts being qualified to testify about accident reconstruction and offer their professional opinions into evidence. Second, the State's lack of physical evidence does not render its case hopeless. It is well established that "the testimony of a single witness, if positive and credible, is sufficient to convict, even though it is contradicted by the defendant." *Siguenza-Brito*, 235 Ill. 2d at 228. In this case, the trial court found "the testimony of Scott and Coady to be more credible and reliable than the testimony of [the] [d]efendant as to the issue of the speed of [the] [d]efendant's vehicle at the point of impact." This is a credibility determination by the trier of fact, and as such, is entitled to great deference because the trier of fact "is in the best position to observe the conduct and demeanor of the parties and witnesses." *People v. Deleon*, 227 Ill. 2d 322, 332 (2008). Accordingly, we will not substitute our judgment for the trial court's. Since the trial court found that the testimony of the State's experts was "positive and credible," it alone

is sufficient evidence to convict, despite the lack of physical evidence on the speed at which the defendant was traveling and his conflicting testimony.

¶ 44　We similarly reject the defendant's contention that the evidence was insufficient because the Searle equation, used by the experts in coming to their opinions, may be invalid. The defendant argues that this court should determine that the Searle equation may be inadequate in that it may not properly take into account various factors important in frictional analysis, such as whether the body was carried instead of immediately thrown, or whether the body had all of its extremities intact. However, we decline to do this because we cannot retry the defendant or reweigh the evidence presented. See *Swenson*, 2020 IL 124688, ¶ 35. It is the trial court that "determines the credibility of the witnesses, decides what weight to give their testimony, resolves conflicts in the evidence, and draws reasonable inferences from that evidence." *Id*. ¶ 36. Our duty is to consider whether, under the evidence presented to the trial court, any rational trier of fact could have found that the Searle equation was adequate.

¶ 45　As the defendant offered no other evidence or experts of his own, the testimony of the State's experts was the only evidence the trial court received on the Searle equation's suitability. The evidence, taken in the light most favorable to the prosecution, established that the Searle equation was "the gold standard in pedestrian vehicle reconstruction crashes," had been used and widely accepted in accident reconstruction work for 40 years, adequately accounted for various frictional factors, and was corroborated in its findings by the officers' observations of the accident scene. Thus, it is clear that a

rational trier of fact could easily have determined that both the Searle equation as well as the officers' conclusions based on the equation were valid and credible.

¶ 46 We therefore conclude that, given the evidence presented, a rational trier of fact could have found beyond a reasonable doubt that the defendant was speeding 35 miles per hour or more in excess of the applicable speed limit at the time of the crash. Thus, we determine that the defendant's sufficiency of the evidence claim fails.

¶ 47                                    B. Excessive Sentence

¶ 48 At his sentencing hearing, the defendant was sentenced to the maximum sentence of imprisonment allowable for a Class A misdemeanor, 364 days in jail. See 730 ILCS 5/5-4.5-55(a) (West 2020). On appeal, the defendant claims that this sentence was excessive. We disagree.

¶ 49 "A reasoned judgment as to the proper sentence to be imposed must be based upon the particular circumstances of each individual case." *People v. Perruquet*, 68 Ill. 2d 149, 154 (1977). These circumstances include the nature of the offense as well as "the defendant's credibility, demeanor, general moral character, mentality, social environment, habits, and age." *Id*. The trial court has a far superior opportunity than a reviewing court to determine and weigh these factors, as it presides over the trial and sentencing hearing. *Id*. In contrast, a reviewing court can only rely on the cold record. *Id*. For this reason, "[t]he trial court has broad discretionary powers in imposing a sentence, *** its sentencing decisions are entitled to great deference," and "the reviewing court must not substitute its judgment for that of the trial court merely because it would have weighed these factors differently" (internal quotation marks omitted). *People v.*

*Alexander*, 239 Ill. 2d 205, 212 (2010); *People v. Stacey*, 193 Ill. 2d 203, 209 (2000). In fact, "absent an abuse of discretion by the trial court, the sentence may not be altered on review." *Id.* at 209-10. Generally, so long as a sentence is within the prescribed statutory range, pertinent mitigating factors have not been ignored, and incompetent evidence has not been considered, it will not be deemed excessive or an abuse of discretion. See *People v. Fern*, 189 Ill. 2d 48 (1999). However, "a sentence within statutory limits will be deemed excessive and the result of an abuse of discretion by the trial court where the sentence is greatly at variance with the spirit and purpose of the law, or manifestly disproportionate to the offense." *Stacey*, 193 Ill. 2d at 210.

¶ 50    As mentioned above, the trial court is required to consider all relevant factors in mitigation before deciding on a sentence. See *People v. Weiser*, 2013 IL App (5th) 120055, ¶ 31. "As long as the court takes into account mitigating evidence before it, it has broad discretion in weighing and balancing the relevant factors. [Citation.] We will not find an abuse of this discretion merely because we might have balanced the factors differently." *Id.* For example, the court is not required to "give more weight to *** defendant's potential for rehabilitation than it gives to aggravating factors, such as the seriousness of the offense." *Id.* ¶ 32. In fact, "[t]he seriousness of the offense is one of the most important factors for the court to consider." *Id.* This court must presume that the trial court properly evaluated all relevant factors in mitigation absent some affirmative evidence to the contrary, excepting the sentence itself. *People v. Busse*, 2016 IL App (1st) 142941, ¶ 22. However, even where the trial court has considered all relevant mitigating factors, the sentence imposed may still be vacated as an abuse of

discretion if it is at odds with the purpose and spirit of the law. *Weiser*, 2013 IL App (5th) 120055, ¶ 33.

¶ 51 The defendant makes two arguments as to why his sentence is excessive. First, he argues that, although his sentence was within sentencing guidelines, it is "grossly at variance with the spirit and purpose of the law and manifestly disproportionate to the nature of the offense," and, as such, constitutes an abuse of the trial court's discretion. We disagree. This offense was extremely serious. While unintentional, the defendant's actions resulted in the violent death of an innocent individual, as well as great and lasting harm to his loved ones. The defendant's sentence was within the statutory limits set for the crime with which he was charged. As the State noted during the sentencing hearing, "the Illinois legislature has determined that when a driver is traveling at a speed as high as this defendant was traveling, that it warrants a maximum sentence of 364 days in jail." We agree with the State that if the defendant has not earned a 364-day jail sentence based upon the circumstances, then it is probable that no defendant charged under this offense would. Additionally, a sentence here is necessary to deter others. Speeding is a crime that is often committed and very rarely taken seriously, and this case proves that it can have massive and devastating consequences. The defendant's own history of multiple traffic offenses reiterates the need for deterrence in this case. Therefore, we find that the defendant's sentence was neither "grossly at variance with the spirit and purpose of the law" nor "manifestly disproportionate to the nature of the offense," and, as such, did not constitute an abuse of discretion by the trial court.

¶ 52 Secondly, the defendant argues that the trial court failed to properly consider all the relevant factors in mitigation. On appeal, a reviewing court presumes that all relevant factors in mitigation were properly considered. See *Busse*, 2016 IL App (1st) 142941, ¶ 22. This presumption must be overcome by affirmative evidence, other than the sentence itself, that they were not. *Id.* ¶ 23. Here, ample evidence exists proving the opposite: that the court took great care to consider all the relevant factors in mitigation. At the sentencing hearing, the court explicitly listed and commented on the mitigation factors it found relevant. At the defendant's motion to reconsider sentence hearing, the court explained that its comments during the original sentencing hearing were "to make clear that this Court had given consideration to all of the relevant factors in mitigation." In his argument, the defendant does not point to any affirmative evidence that the court did not take these mitigation factors into account. Instead, he acknowledges that the court did mention these factors and centers his discussion on arguing that the factors were incorrectly weighed. However, this court will not find an abuse of discretion simply because we might have balanced the factors differently. *Weiser*, 2013 IL App (5th) 120055, ¶ 31. As the defendant has failed to produce any affirmative evidence to support his argument, the initial presumption has not been overcome, and the defendant's argument that the court abused its discretion by sentencing him without considering all the relevant mitigation factors fails.

¶ 53 Accordingly, we conclude that the sentence is not excessive. The trial court did not impose a sentence that is grossly at variance with the spirit and purpose of the law or manifestly disproportionate to the nature of the offense. Before handing down the

sentence, the trial court properly considered all the relevant factors in mitigation. Thus, we determine that the trial court did not abuse its discretion in sentencing the defendant to 364 days in jail.

¶ 54                                    III. CONCLUSION

¶ 55    As a rational trier of fact could have found beyond a reasonable doubt that the defendant was guilty of speeding 35 miles per hour or more above the speed limit, the evidence is sufficient to support a guilty verdict. As the trial court did not abuse its discretion in sentencing the defendant to 364 days in jail, the sentence is not excessive. Accordingly, the judgment of the circuit court of Shelby County is affirmed.


¶ 56    Affirmed.